United States District Court
Southern District of Indiana
Indianapolis Division

JOHN DOE,

    *Plaintiff*,

    v.                Case No. 1:20-cv-00123-JRS-DML

INDIANA UNIVERSITY at BLOOMINGTON,[1]
PROVOST LAUREN ROBEL, KATHY
ADAMS-REISTER, LIBBY SPOTTS, ROBERT
BILLINGHAM, MICHAEL COURTNEY, and
GRANT VOGTMAN

    *Defendants.*

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER

In the fall of 2019, plaintiff John Doe ("Plaintiff") was charged with committing felony sexual misconduct against a minor. A state court judge signed an arrest warrant, agreeing that probable cause supported the charge. Defendant The Trustees of Indiana University ("University") summarily suspended Plaintiff on safety grounds, but promptly scheduled a hearing on a date agreed upon by Plaintiff, where Plaintiff was afforded the opportunity to respond.

At that two-hour-long hearing, Plaintiff called his sister ("Sister") as a witness, and they spoke and were questioned at length about the incident giving rise to the felony charge. They confirmed—as Plaintiff repeats in his verified complaint—that a female minor ("Girl 1") was (i) with Plaintiff, (ii) in his bedroom, and (iii) naked below the waist. But the siblings suggested that

---

[1] The proper name for Defendant Indiana University at Bloomington is "The Trustees of Indiana University," *see* Ind. Code § 21-27-4-2, (herein, "the University"). The proper name for Defendant Vogtman is "Graham," not Grant.

Girl 1, having consumed no alcohol, pulled her own clothes off, "was caught," became embarrassed, pulled her clothes back on, and left the room—with no one speaking of the matter ever again. The hearing commissioners justifiably found the siblings' story so thoroughly inconsistent, implausible, and unconvincing that—far from exonerating—their story tended to confirm that the incident giving rise to the felony charge had in fact happened. Therefore, they found that Plaintiff's continued presence on campus constituted a serious threat of harm. On appeal, Provost Robel upheld the suspension.

After a state prosecutor found probable cause that Plaintiff committed a felony sex crime, and a state judge agreed—and now that the hearing commissioners listened to Plaintiff's proffered explanation, but found that it did more to confirm than disprove his wrongdoing—Plaintiff asks this Court to take the extraordinary step of ordering the University to reinsert him into the campus population. Plaintiff's requested injunctive relief should be denied.

Plaintiff waited roughly a month after the University's three-step process was completed to file this lawsuit and request a TRO, delaying those filings until Spring semester classes had already started. That delay is incompatible with the emergency relief Plaintiff now seeks through a TRO. Aside from that delay, he has not pleaded a Title IX case; no allegation plausibly suggests that his gender—or the gender of the child he is presently charged with committing a sex crime against—played any role in his removal from campus. Unlike the recent *Purdue University* case Plaintiff argues is controlling, no allegation suggests that the University reflexively believed females, but disbelieved males. Plaintiff pleads the opposite, complaining that the University did not believe his female Sister's alibi statement, but did place weight on the male county prosecutor's decision to pursue charges. Gender had nothing to do with Plaintiff's suspension.

Plaintiff's due process claim also fails. He has no cognizable liberty or property interest that the University *could have* taken without due process. Even if he did, the hearing conducted by

the University—the entire transcript of which is being provided concurrently to the Court—was not a "sham." Plaintiff's main argument is that he had a right to cross-examine his accuser at the hearing. No binding precedent mandates that any student be allowed to directly cross-examine an accuser, even in purely internal campus disciplinary matters. Beyond that, there is a no contact order entered in Plaintiff's criminal case (unmentioned in his filings), forbidding Plaintiff from interacting with his minor accuser, including "through intermediaries." The act of him cross-examining Girl 1, a minor child, could not only result in the revocation of his bail, it could also subject him to an additional Class A misdemeanor. It could even subject University employees who aided him to the same. Moreover, Girl 1 remains anonymous to the University under Indiana's criminal procedure laws, which protect the privacy of sexual assault victims. Thus, the course of conduct recommended for the University by Plaintiff—which Plaintiff also asks this Court to order the University to do— falls somewhere on the spectrum between illegal and impossible.

Aside from this threshold failure of having no cognizable claims, neither the elements of irreparable injury, the balance of harms, nor the public interest support Plaintiff's request. Plaintiff believes he might have difficulty applying to another educational institution. But injunctive relief aimed at undoing the University's disciplinary proceedings would not help Plaintiff in any event, since he still faces public felony sex crime charges, which pose the same (if not a worse) impediment to him applying to other institutions.

Finally, Plaintiff's argument that the University was legally mandated to procure the presence of his accuser—a minor child, who does not attend the University, and whose identity the University does not know—so that he could subject her to cross-examination in advance of his upcoming criminal trial, would violate the public's interest in the orderly operation of the state's criminal justice system. Granting Plaintiff's requested relief on this asserted basis would require

the University, and other similarly situated educational institutions going forward, to risk interfering with the state prosecutor's and court's ability to manage and control ongoing felony criminal proceedings. No case or principle counsels such an extreme result; Plaintiff's request for injunctive relief must be denied.

### Factual Background

This litigation remains in its early stages, with limited discovery. Many of the basic facts asserted in Plaintiff's verified complaint will be uncontested. Those allegations, however, skew or omit crucial circumstances of this case, which the University will supplement below.

### A. Plaintiff's allegations

Plaintiff joined the University as a freshman in fall 2019. (DE #3, ¶ 3.) He was summarily suspended from the University on November 11, 2019. (*Id.*) Plaintiff had been arrested for allegedly committing sexual misconduct against Girl 1. (*Id.* ¶ 5.) Based on that arrest, the University invoked its summary suspension procedure, with a preliminary finding that Plaintiff's "continued presence on campus constitutes a serious threat of harm to yourself and/or others on the campus," but also quickly provided Plaintiff (within four days) the opportunity to be heard on the issue before the University Hearing Commission. (*Id.* ¶ 7–9.) Indeed, Libby Spotts (a named defendant) contacted Plaintiff the very next day after he received the November 11 letter to schedule the hearing he requested. (*Id.* ¶ 54.) The Commission consisted of three individuals—two faculty members and one student ("the commissioners")—who are also named as individual defendants in this case. (*Id.* ¶ 8.)

At that November 15 hearing ("Hearing"), Plaintiff appeared. (*Id.* ¶ 9.) Over the course of more than two hours the University devoted to the Hearing (*id.* ¶ 74), he spoke and answered questions; so did his alibi witness Sister. (*Id.* ¶ 9.) Plaintiff finds his own story "persuasive and unrefuted" and that it conclusively "establish[es] that [Girl 1's sexual misconduct] allegations

against John are false." (*Id.* ¶ 46.) The University disagrees with that assessment.

According to Plaintiff and Sister, on July 4, the two of them and Girl 1 all went into Plaintiff's bedroom after a day of boating to take a nap together. (*Id.* ¶ 65–66.) The siblings say they both woke up, looked over, and—with no further explanation given—Girl 1 was standing in the corner of the room with her shorts off, naked below the waist. (*Id.* ¶ 71.)[2] Perhaps understating the matter by calling this "odd behavior," Plaintiff also claims that "no one ever spoke of" it in the many months since. (*Id.*)

While the siblings confirmed one of the central allegations in the criminal matter—that Girl 1 was naked below the waist with Plaintiff in his bedroom—the commissioners did not accept their proffered explanation: that she was naked only because she, without explanation, pulled her own clothes off, only to become "noticeably embarrassed when she realized she was caught." (*Id.* ¶ 71.) Even though Plaintiff says this story "definitively proved the complainant's allegations were false" (*id.* ¶ 75), the commissioners and Provost Robel disagreed; they upheld the suspension. (*Id.* ¶ 14.) Notably, Girl 1's side of the story *did* convince both a state prosecutor to pursue sexual misconduct charges, and a state judicial officer to agree that probable cause existed to allow a felony criminal case to proceed. The commissioners placed evidentiary weight on those independent third-party determinations.

Plaintiff calls the Hearing where he presented this story and the commissioners listened and asked questions for "approximately two hours" (*id.* ¶ 74), "a sham disciplinary proceeding from hearing through appeal," and that "the outcome … was predetermined and the hearing itself was nothing more than pretense." (*Id.* ¶ 13–14.) Plaintiff came to that conclusion, in part, because the University did not call Girl 1 as a witness or obtain a statement from her (*id.* ¶ 14). Plaintiff

---

[2] One of the two central allegations made by Girl 1 in the criminal case is that Plaintiff pulled her shorts and underwear off while she was sleeping, see DE#2, pp. 5–6 ("She also claims she fell back asleep and when she woke a second time, John had removed her pants and was attempting to have sexual intercourse").

never explains how the University could have compelled her attendance (she is not a University student), how the University could have contacted her (Indiana's criminal procedure laws protect the identities of sexual assault victims),[3] nor how the University could either compel her attendance or contact her without interfering with the ongoing criminal proceedings (there is a no-contact order in place forbidding contact between Plaintiff and Girl 1). Indeed, Plaintiff never alleges that anyone at the University knows the name, address, or contact information for Girl 1. (*See generally, id.*)

Plaintiff alleges the Hearing violated the United States Constitution and federal statutory law. (*Id.* ¶ 15(a)–(d).) Plaintiff claims that "the commissioners made no findings regarding the exculpatory testimony [Plaintiff] presented in his defense," (*id.* ¶ 16), but as described below, that allegation is flatly contradicted by the undisputed evidentiary record.

**B. Additional facts**

Plaintiff's complaint omits much of the factual record, including most crucially what took place at the Hearing. The specific statements presented by the siblings at the Hearing made even less sense than the facially implausible story in Plaintiff's complaint. When combined with the independent determination by the state prosecutor that Girl 1's accusations are true, the commissioners had ample grounds to rationally conclude by a preponderance of the evidence that Plaintiff's presence on campus posed a threat to the campus community.

**a.  The siblings' stories were inconsistent and implausible**

The University followed its summary suspension procedures once informed that Plaintiff may have committed a felony sex crime. Those procedures, available at https://studentcode.iu.edu/procedures/bloomington/discipline/personal-misconduct/action.html provide the University with the ability to summarily suspend a student if the Provost or her designee "is satisfied

---

[3] *See* Ind. Code § 35-40-5-12 (requiring anonymity in all public court documents for cases involving sex crimes).

that the student's continued presence on the campus constitutes a serious threat of harm to the student or to any other person on the campus." The student is then given the right to present evidence, call witnesses, seek advice, and to make his case to the University. (*See generally*, Ex. D, Libby Spotts Decl.) Plaintiff did so in this matter.

At the Hearing, Plaintiff had the assistance of attorney David Kolbe. (Ex. A, 2:8–10.) Libby Spotts explained why the nature of the felony charge concerned the University: the personal misconduct policy "connects specifically threatening or dangerous behaviors of students off campus to expectations of them as an Indiana University student"; Spotts noted that the felony charge involved a sleeping victim, "[a]nd so if you transfer that into expected environments ... being in a residence hall, being around other students, that becomes quickly a concern." (*Id.* 5:10–22.) After that, the commissioners gave Plaintiff substantial latitude to respond to the charges: "So, [John Doe], this is when you get to tell us your story." (*Id.* 6:23–24.)

Plaintiff recounted that on the day in question, he slept in a bed with Sister and Girl 1, then "I poked my head up and I saw the girl squatting in the side of my room, in the corner of my room, with her pants down ... She put her head down, looking you know a little embarrassed, she pulled her pants up and then she left the room not saying another word to me or my sister." (*Id.* 7:23–8:2.) When asked why the two girls were sleeping in his bed, Plaintiff recalled that (i) he told Girl 1 to leave, (ii) he told both girls to leave, and (iii) now that he thought about it for the first time, maybe told neither of them to leave—all within the space of about 15 seconds:

[JD] So the girl was asleep at the time and then my sister, uh I don't exactly remember if she was awake or not. Um I may have asked, you know, her to get out – **the point was that I asked her to you – the point was that I asked her to leave**. I don't exactly remember. But, um, I just remember laying down in my bed regardless. They didn't leave – they both stayed in my bed.

[u/k] So you asked your sister to leave, is that correct?

[JD] No, **I said I may have asked them both to leave**, but I don't remember. Uh, this was, this was in July. And you know I hadn't even thought about this for months. But, um. **As I recall I don't believe that I'd asked them**. I said that I may have. **I don't believe**

**that I did** because they obviously didn't leave the room, so I just remember laying down and falling asleep.

(*Id.* 9:19–10:5 (emphasis added).)

According to the siblings, neither of them ever mentioned the incident to anyone, including to each other. Plaintiff attempted to explain, "No I had not for the purpose of, how I'd mentioned earlier that it was, it was something kind of embarrassing and I didn't really feel like I should be sharing, I would share that with anybody else at the time that I was with the people that were with us.  And so for that reason I didn't share the events with anybody else." (*Id.* 13:1–4.) Sister said, "It was just kind of an odd occurrence and we didn't really think much of it." (*Id.* 48:21–23.) The idea that no one ever mentioned the incident in the months since struck the commissioners as odd, and they repeatedly sought clarification: "[u/k] Did it seem unusual? [KS] Yes. [u/k] But not so unusual that you never talked about it again. Is that – and tell me if I'm wrong because that's what I'm hearing is this occurred, you looked at her, you said what are you doing, she left, and you never talked about it again, is that correct?" (*Id.* 56:10–15.) Sister's answer: "I just kind of moved on to something else." (*Id.* 56:20.)

At various times, Plaintiff and Sister advanced what perhaps could have been a plausible explanation for their story, namely that Girl 1 may have been intoxicated when she took her bottoms off. Plaintiff thought maybe Girl 1 was squatting "to use the bathroom because uh whether she had been, you know, whether she'd been drinking or whether she was just out of it, I'm unsure." (*Id.* 12:1–11.) But Plaintiff then said he could not recall Girl 1 drinking anything but water. (*Id.* 13:12–18.) Sister said of Girl 1 and "Girl 2" (a relative of Girl 1, who Sister said she was closer with and who was also in the house), "they never really left my side ... like I was with them all day long." (*Id.* 41:12–22.) When asked about alcohol, Sister said that she "didn't see any of it" but "by the way people were acting, possibly yes, but as far as I can remember I did

not see anybody drink anything." (*Id.* 47:4–9.) The only example she could recall of people acting like they may have been drinking was "the whole thing with Girl 1 and the little incident with the trash can ... I mean like I don't think that anybody that was not under the influence of anything would have done something like that ... but um that's the only time I can think of somewhat odd behavior, per se." (*Id.* 47:15–19.)

Of course, these statements make no sense. Sister said that (i) Girl 1 never left her side the entire day, (ii) Sister never saw anyone (including Girl 1) drink any alcohol, but (iii) Girl 1 somehow woke up from a nap so drunk that she attempted to urinate in a trash can. Incidentally, the commissioners asked Sister whether anything was in the trash can after Girl 1 supposedly squatted over it to urinate; Sister said there was nothing in it. (*Id.* 47:15–19.)

Another odd aspect of the case appeared during the Hearing. For reasons that remain unclear, Sister stopped being friends with Girl 1 and Girl 2 starting on July 4. Plaintiff said, "After this incident had occurred, my sister and the acquaintance's relative, which would be considered [Sister]'s friend, they quit being friends at the time." (*Id.* 34:19–21.) Sister decided, with no further explanation, "I didn't really find, like I didn't really want to, I guess. Like we weren't really that close in the beginning, so I never really felt comfortable hanging out with them." (*Id.* 48:21–49:2.)

This also struck the commissioners as strange: "Okay, help me. And again, I'm not trying to delve I'm just trying to be clear on this.  So one of the first things that you said was, um, Girl #1 tagged along with Girl #2, my friend, went out on the boat and they never left my side.  But it sounds like a pretty close friend.  And then all of a sudden, not friends anymore?" (*Id.* 49:7–10.) Sister responded, "Um, we were never really that close. I mean, like, I guess you would say we were friends." (*Id.* 49:11–12.) A few moments later, when asked why she was sleeping in the same bed as someone she was "never really that close" with, Sister responded, "Uh, I should be

friends with everyone. So ...” (*Id.* 57:10–17.)

Another aspect of the Hearing jumps out from the transcript, namely the lengths to which the commissioners repeatedly tried to understand the siblings' story without prejudging the case. As one commissioner put it, after repeatedly hearing that neither Plaintiff nor Sister had ever mentioned the incident with Girl 1 since it happened, including to each other,

> [JD] Does that make sense? Sort of like a topic of embarrassment. I wouldn't really want something saying – repeating that to anyone else. Does that make sense?

> [u/k] Well I mean I'm sure it makes sense to you. Um, I don't want to impose my own way of looking at things upon you.  Um I exist in the space that I exist and it's filled with a lot of critical reflection.  Um I also teach that.  Uh, so this is the lens through which I look at things.  So when I, from an outside perspective, am hearing and try to picture um the scene that you describe, um, for me personally, um I would be reflecting on that moment because it seems unusual to me.  But I can't impose that upon you.

(*Id.* 35:22–36:7.)

Plaintiff's filings repeatedly state that the "sole" reason the commissioners upheld his suspension was the pending criminal charge. That is false. The *first* articulated basis offered by the commissioners was the inconsistent stories. (*Id.* 65:5–9 ("I think we all agree this was a very complicated and difficult case. Uh, but we did in fact find that you are responsible by a vote of 3-0 and that decision was based on what we believe were inconsistencies in the testimony related to critical incidents, particularly the incident in the bedroom").) Based on those inconsistencies, combined with the fact that "the prosecutor decid[ed] there is enough evidence in the case to file a level 6 felony," the commissioners unanimously agreed: "we believe that is more likely that the incident occurred than it did not." (*Id.* 65:9–14.)

### b.  Procedural aspects of Plaintiff's criminal case

The state of Indiana filed a "charging information," the functional equivalent of an indictment, on September 26, 2019, charging Plaintiff with Level 6 Felony Sexual Misconduct with a Minor, Ind. Code § 35-42-4-9(b). That same day, the trial court Judge signed and entered a "No

Contact Order Upon Release from Custody on Bail or Personal Recognizance." (Ex. C) The Judge found it was "necessary to preserve the safety, peace, and dignity of the community as well as the safety of the alleged victim(s)/witness(es) named herein." Plaintiff's compliance with that no-contact order is "a condition of [his] release from custody pending trial."

The Order says, Plaintiff "IS ORDERED TO HAVE NO CONTACT WITH: [Girl 1], in person, by telephone or letter, *through an intermediary*, or in any other way, directly or indirectly, except through an attorney of record, while released from custody pending trial." (emphasis added). The Order also puts Plaintiff on notice that any violation would constitute an additional crime of Class A Misdemeanor Invasion of Privacy, Ind. Code § 35-46-1-15.1(a).[4] Plaintiff's felony criminal case remains pending, and is scheduled for a March 2020 trial.

## Legal Standard

To obtain injunctive relief, Plaintiff has the initial burden of showing that (1) he has a reasonable likelihood of success on the merits; (2) he has no adequate remedy at law; and (3) he will suffer irreparable harm without injunctive relief. *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 193 (7th Cir. 2015), *as amended* (Dec. 14, 2015). If Plaintiff meets this "threshold burden," then the court balances the harm to the movant absent injunctive relief against the harm to the opposing party if injunctive relief were granted, and considers the public interest in granting or denying injunctive relief. *McCleskey v. Hooks AV, LLC*, No. 118-CV-02397-JRS-DML, 2018 WL 5255011, at *1 (S.D. Ind. Oct. 22, 2018). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (emphasis original)

---

[4] Unless the University found some workaround, perhaps by figuring out Girl 1's identity, contacting her parents, and figuring out whether she was represented by counsel, University employees could theoretically be subject to the same charge if they knowingly or intentionally aided Plaintiff in violating the no-contact order. Ind. Code § 35-41-2-4.

(*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997))).

In considering this extraordinary remedy, courts balance the competing claims of injury and the effect on each party of the granting or withholding of the requested relief. *See Eckes v. Byrd*, No. 2:18-cv-00246-WTL-DLP, 2018 WL 4001737, at *1 (S.D. Ind. Aug. 22, 2018) (*citing Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). This balancing is done by way of a sliding scale approach: "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation and internal quotation marks omitted). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (*quoting Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

Here, the relief Plaintiff is requesting is particularly extraordinary; Plaintiff seeks an "affirmative" or "mandatory" injunction that would compel the University into action rather than merely maintain the status quo. *See Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). A "preliminary injunction ordering the defendant to take an affirmative act rather than merely refrain from specific conduct is 'cautiously viewed and sparingly issued.'" *Knox v. Shearing*, 637 Fed. Appx. 226, 228 (7th Cir. 2016) (*quoting Graham*, 130 F.3d at 295). For such affirmative injunctions, the balance of hardships factor "takes on heightened importance." *Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011).

## Argument

Although Plaintiff has styled his motion as one for a temporary restraining order, there is no emergency calling for such drastic relief. Whether styled as a TRO or an injunction, his request must be denied. He cannot plead, let alone prove, a claim upon which relief could be granted.

Even if Plaintiff had *any* chance on the merits, the balance of harms weighs strongly against him. The "costs of being mistaken" would be compelling the University (and other similarly situated institutions going forward) to reinsert a potential felon—presently charged with committing a sex crime against a sleeping minor—amidst the University's population of students, whose safety and security are of paramount importance to the University.

## I.   Plaintiff is not entitled to any injunctive relief, especially not a TRO; there is no emergency that a TRO could resolve.

Plaintiff has filed for a TRO (DE #1). He has not filed a motion for a preliminary injunction. Plaintiff's request for a TRO is procedurally inappropriate for two reasons.

First, TROs under "Rule 65(b) permit[] emergency action while ensuring that district courts use an adversarial, rather than an inquisitorial and ex parte approach, as soon as time allows." *Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 496 F.3d 769, 771–72 (7th Cir. 2007); *Crue v. Aiken*, 137 F. Supp. 2d 1076, 1082 (C.D. Ill. 2001) (TRO is an "emergency remedy"). Plaintiff's conduct belies the notion that he requires "emergency action" from this Court.

Provost Robel denied Plaintiff's December 4, 2019 appeal—a sixteen page, single-spaced, thoroughly researched submission drafted by his present counsel (DE #2-3)—on December 16, 2019. (DE #2-4.) Plaintiff then waited nearly a full month following that denial, and nearly a month-and-a-half since he had substantially prepared the same arguments presented in his TRO motion, to file his request for a TRO. Such delay is incompatible with the "emergency" relief Plaintiff now seeks.

Second, Plaintiff's TRO motion does not request "to maintain the status quo," until a pre-liminary injunction hearing can be held, *Crue*, 137 F. Supp. 2d at 1082; he requests that this Court overturn the status quo of his suspension and affirmatively enjoin the University into action. If anything, this affirmative request to overturn the status quo should have been made even earlier; the request for an emergency mandatory injunction is also incompatible with Plain-tiff's nearly month-long delay.

Neither the Court nor the University have completely open schedules, and the Court rea-sonably scheduled the TRO hearing for February 11, 2020. By that time, the University's classes will have been in their fifth week. Plaintiff's delay means that even if his requested TRO were granted, he will be at least five weeks behind in his classes, and his professors would face addi-tional if not impossible burdens in attempting to catch him up. In these circumstances, the more sensible approach to this case would be to litigate on a standard timeframe where, if he manages to find success on the merits, he could rejoin the University or another educational institute in time for the summer session.

In short, now that Plaintiff's delay has made the emergency relief he requests impractical to grant (aside from the merits), the Court should deny Plaintiff's requested TRO so that the par-ties and Court can resolve this case on a non-emergency basis. Plaintiff's TRO should be denied, however, regardless of his chosen delay.

## II.   Plaintiff cannot make his threshold showing to support injunctive relief: he has no likelihood of success on the merits; and any irreparable harm he faces comes from his public felony charges, not the University's confidential disciplinary proceeding.

Plaintiff has no likelihood of success on the merits. The University expects this litigation to end in summary disposition, either on a Rule 12 motion or on summary judgment, because Plaintiff has not plausibly pleaded and cannot prove his claims under either a Title IX or a due process clause theory.

**A.  Plaintiff has no likelihood of success on the merits of his Title IX claim: there is no plausible allegation, much less evidence, of gender bias.**

Title IX provides, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The University does not dispute that it receives federal funding, or that Plaintiff was "excluded from participation in [or] denied the benefits of … [an] education program" when the University suspended him. 20 U.S.C. § 1681(a). Plaintiff's claim under Title IX fails, however, because he has not plausibly pleaded, and certainly has not demonstrated with evidence, that the University made its determination "on the basis of sex."

Other circuits have complicated, multiple-element tests aimed at resolving this question. But our circuit "prefer[s] to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex'?" *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019). Generalized allegations of gender discrimination are not sufficient to state a claim under Title IX. *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 856 (7th Cir. 2019) (a "particularized 'something more' … is required to survive a motion to dismiss" an alleged Title IX violation).

**(1)  *While the recent* Purdue *decision is a leading case in this context, it has only a superficial resemblance to Plaintiff's lawsuit.***

The University agrees with Plaintiff that *Purdue Univ.*, 928 F.3d at 652, is a leading case on this area of law in this circuit. The University disagrees, however, that the case supports his legal position. For one thing, the posture of *Purdue Univ.* was limited to a Rule 12 dismissal, without regard to any evidence. *Id.* at 670 ("To be sure, John may face problems of proof, and the factfinder might not buy the inferences that he's selling.") Even on that truncated Rule 12 analysis, Plaintiff's case is clearly distinguishable, as explained below.

In *Purdue Univ.*, the plaintiff ("Purdue John") was expelled from the university, as well as

its Navy ROTC program, based on an allegation of sexual assault brought by a female, who was also a Purdue student ("Purdue Jane"). Nothing in the case suggests that state prosecutors were involved; instead, the matter was completely internal to the university. Purdue Jane told university officials that she had, six months earlier, awoken to Purdue John groping her over her clothes. *Purdue Univ.*, 928 F.3d at 656-57. She also told the university that Purdue John had confessed to digitally penetrating her while she slept. *Id.* at 657.

Purdue John received a letter from Purdue's Dean of Students, and Title IX coordinator, who "informed John that the university had elected to pursue Jane's allegations even though Jane had not filed a formal complaint." *Id.* Purdue John flatly denied all of the allegations, but said there was one time he touched Purdue Jane's knee. He then appeared before a three-person committee, who had been given an investigatory report that "falsely claimed that he had confessed to Jane's allegations." *Id.*

The Purdue hearing lasted around 30 minutes. Purdue John gave a statement, but he was not permitted to call any witnesses. Nor did Purdue Jane make any statement for the hearing, either in person or in writing. The Dean then informed Purdue John that she had found him guilty by a preponderance of the evidence. The Dean subsequently explained, she found Purdue Jane was "a credible witness" and Purdue John "was not a credible witness," *id.* at 658—a "perplexing [conclusion], given that she never talked to Jane. Indeed, Jane did not even submit a statement in her own words to the Advisory Committee." *Id.* at 669. After his appeals were denied, Purdue John was forced out of the Navy ROTC program, which "terminated both his ROTC scholarship and plan to pursue a career in the Navy." *Id.* at 656.

(2)   *Plaintiff's case is distinguishable, both for Rule 12 purposes as well as on the evidentiary record.*

Plaintiff's filings make repeated reference to *Purdue Univ.*, but his case bears only a superficial resemblance. For Title IX purposes, Plaintiff's case is distinguishable for four reasons.

First, *Purdue Univ.* involved a plausible overarching allegation that the university suspended Purdue John based on a default or automatic, "believe females, disbelieve males" standard. The Purdue Dean found Purdue Jane to be "a credible witness," even though she never met her and Purdue Jane never testified at the hearing. Because Purdue automatically credited the female's account, while discrediting the male's account, Purdue John plausibly alleged that Purdue discriminated against him "on the basis of sex." *See e.g. Doe v. Columbia Univ.*, 831 F.3d 46, 58 n.11 (2d Cir. 2016) ("A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination").

Here, in upholding Plaintiff's suspension, the commissioners (all males) necessarily *disbelieved* the female Sister's account. Plaintiff also argues the University placed improper weight on the criminal charges pending against him, but that equates to a complaint that the University improperly *believed* the male prosecutor who saw enough evidence to pursue charges, and the male state court judge who agreed that sufficient evidence supported the case moving forward. Under Plaintiff's own allegations, the University's credibility determinations cut across gender lines. *Cf. Columbia Coll. Chicago*, 933 F.3d at 855 ("For example, in [*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018)], the court noted that the hearing panel credited witness testimony based on gender—the panel discredited the testimony of all males, including the accused, and credited the testimony of all females, including the victim"). Indeed, the University has never claimed that it made a credibility determination as to Girl 1 at all. Rather, the commissioners found that Plaintiff's and Sister's inconsistent stories lacked credibility. And the commissioners noted that an independent third-party, the state prosecutor, had deemed Girl 1's side of the story credible enough to file felony charges. This is also unlike *Purdue Univ.*, where the Dean seemed to invent a credibility finding for Purdue Jane out of thin air; nothing like that happened here.

Second, and related, Plaintiff's own allegations provide a plausible reason to discredit his story, unrelated to gender. In *Purdue Univ.*, Purdue Jane said that Purdue John touched her far above her knee, toward her crotch, but he said he touched her *on* her knee, and flatly denied all other accusations. Neither story is inherently more believable than the other, so when Purdue picked her story over his (with no further inquiry), the decision raised the possibility that gender was the deciding factor. Here, Plaintiff confirmed at the Hearing that he was in his bedroom with a minor child, who was naked below the waist, but provided the inherently unbelievable explanation that she (perhaps while drunk, even though she never left Sister's side and Sister never saw her consume alcohol) pulled her own clothes off while he and his sister slept, then pulled her clothes back on after she "was caught," and then left without saying a word.

The commissioners concluded, based on common sense, that the siblings' story seemed implausible on its face, and sounded more like a false alibi statement. A false or unbelievable statement aimed at exoneration, by itself, is evidence of wrongdoing, without regard to the gender of the person giving it. *E.g., Wilson v. United States*, 162 U.S. 613, 620–21 (1896) (finders of fact can take false alibi statements not only to "determin[e] whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made, as in themselves tending to show guilt").

Third, the University has no control over or relationship with Girl 1, a non-student, and no authority to subpoena her or obtain a statement from her. This is unlike *Purdue Univ.*, where Purdue Jane was a student who initiated the allegations against Purdue John through university channels, and where the university decided to pursue claims against Purdue John despite the fact that Purdue Jane did not wish to file a formal complaint or participate in the process.

Fourth, and related, there is a no-contact order entered in Plaintiff's criminal case, which

prohibits contact between him and Girl 1. Plaintiff has not explained how or why the University could be legally required to help him violate that no-contact order, by procuring her presence at the Hearing so that Plaintiff could cross-examine his minor accuser in advance of his March criminal trial date. Indeed, the University does not know the identity of Girl 1, her address, or her phone number, and has no way of contacting her.

In addition to this case being completely distinguishable from *Purdue Univ.*, Plaintiff has pleaded no other plausible basis to find that the University discriminated against him "on the basis of sex." *Cf. Marshall v. Indiana Univ.*, 170 F. Supp. 3d 1201, 1209–10 (S.D. Ind. 2016) (Title IX allegation plausible where university only investigated female's sexual assault accusation against male but ignored male's sexual assault accusation against female). Plaintiff thus has not even alleged a plausible Title IX violation. *Columbia Coll. Chicago*, 933 F.3d at 856 ("In sum, there is simply no way to plausibly infer that Columbia's investigation or adjudication was tainted by an anti-male bias. Doe fails to allege particularized facts that could lead to a reasonable inference that Columbia denied him an educational benefit because of his sex."). The University expects Plaintiff's Title IX theory to be dismissed at the Rule 12 stage in the ordinary course.

## B. Plaintiff has no likelihood of success on the merits of his due process claim: he has no cognizable interest to assert; but even if he did, the University's process was fair under the circumstances.

The other legal theory Plaintiff brings is a claim that the University violated his right to due process. The Fourteenth Amendment to the United States Constitution says the State "shall [not] deprive any person of life, liberty, or property, without due process of law." By its terms, the University would owe Plaintiff due process rights only if it sought to deprive him of life, liberty, or property.

"There are two steps to any procedural due process analysis. First, the court must identify the protected property or liberty interest at stake. Second, it must determine what process is due

under the circumstances." *Charleston v. Bd. of Trs. of Univ. of Ill. at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013). While some disciplinary decisions made by universities *can* implicate a student's liberty or property interests, under Seventh Circuit precedent, Plaintiff has no cognizable liberty or property interest to assert in this case.

(1)   *In this circuit, Plaintiff has no cognizable property interest in receiving an education from the University*

As the *Charleston* panel noted, "our circuit has rejected the proposition that an individual has a stand-alone property interest in an education at a state university" like the University here. *Id.; see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009); *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008). The Seventh Circuit has repeatedly reaffirmed that conclusion, as a contrary result "would imply that a student who flunked out would have a right to a trial-type hearing on whether his tests and papers were graded correctly and a student who was not admitted would have a right to a hearing on why he was not admitted." *Charleston,* 741 F.3d at 773 (citing *Williams*, 530 F.3d at 589).

The recent *Purdue Univ.* decision, 928 F.3d at 652, says no different. It noted that other circuits, like the First, Sixth, and Tenth—incidentally, the majority of case law cited in Plaintiff's papers comes from these circuits—have come to a different conclusion, *id.* at 659 n.2, but also reaffirmed its previous holdings that "[a] college education—any education—is not 'property' in the usual sense of the word." *Id.* at 659 (*quoting Williams*, 530 F.3d at 589). The *Purdue Univ.* panel agreed with the district court's decision at the Rule 12 stage that the plaintiff had not pleaded a cognizable property interest. *Id.* at 659–60.

Plaintiff's Complaint, as well as the evidentiary record, compels the same finding here. Plaintiff has no property interest in remaining at the University that could have been taken without due process.

- 20 -

(2)     *Plaintiff also has no cognizable liberty interest to assert in this case.*

Plaintiff's other option for showing that the due process clause is implicated is to show that the University deprived him of a "liberty interest." Plaintiff's only possible claim on this basis would be to invoke the "stigma plus" test.

The Seventh Circuit has recognized a valid liberty interest where a person's good name, reputation, honor, or integrity is called into question in a manner that makes it virtually impossible for the person to find new employment in their chosen field. *Khan v. Bland*, 630 F.3d 519, 535 (7th Cir. 2010). Yet mere defamation by the government does not deprive a person of a protectable liberty interest, even when it causes serious impairment of one's prospects. *Khan*, 630 F.3d at 534. To avoid constitutionalizing state defamation law, defamation by a government actor does not implicate the due process clause unless "'a right or status previously recognized by state law was distinctly altered or extinguished' as a result." *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010) (*quoting Paul v. Davis*, 424 U.S. 693, 711 (1976)). "To avoid this problem, a plaintiff must allege that '(1) he was stigmatized by the defendant's conduct, (2) *the stigmatizing information was publicly disclosed* and (3) he suffered a *tangible loss of other employment opportunities as a result* of the public disclosure.'" *Abcarian*, 617 F.3d at 941 (*quoting Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001)) (emphasis added).

The *Purdue Univ.* panel followed this line of cases. While it found that Purdue John did not have a property interest at stake, he *did* plead a plausible liberty interest for two reasons. First, Purdue had mandated the public disclosure of its disciplinary determination to the Navy. *Purdue Univ.*, 928 F.3d at 662 ("Purdue, not John, revealed to the Navy that it had found him guilty of sexual violence, and John had a legal obligation to authorize the disclosure. Thus, if what John says is true, the university has stigmatized him by telling the Navy about the guilty finding."). Second, that public disclosure to the Navy altered his legal status in a manner that foreclosed him entering his career of choice. *Id.* at 662-63 ("it was this official determination of guilt, not

the preceding charges or any accompanying rumors, that allegedly deprived John of occupational liberty. It caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the possibility of his re-enrollment in it").

Here, Plaintiff cannot invoke this "stigma plus" doctrine for three reasons: the University's actions remain private; they have caused Plaintiff no tangible harm to his "occupational liberty"; and the speculative future harm he predicts (if actionable) would stem entirely from his public sex crime charge, rather than the University's private disciplinary determination.

     a.    *Plaintiff has not pleaded, and cannot prove, that the University publicly disclosed stigmatizing information.*

The University will assume without argument that its determination that Plaintiff poses a safety risk to the campus would qualify as "stigmatizing." The University, however, has never disclosed that finding anywhere. It remains confidential, and Plaintiff does not allege otherwise. This undisputed fact alone renders the "stigma plus" doctrine unavailable to Plaintiff. *Abcarian*, 617 F.3d at 941; *cf. Purdue Univ.*, 928 F.3d at 662-63 (doctrine available where Purdue mandated disclosure of its adjudication to plaintiff's chosen career employer, the Navy).

     b.    *Plaintiff has not pleaded, and cannot prove, any tangible losses stemming from the University's disciplinary decision.*

As discussed, even if the University had disclosed its action, mere damage to Plaintiff's reputation via defamation from a government actor is not enough. *Abcarian*, 617 F.3d at 941. Rather, Plaintiff must show that he suffered a tangible loss of employment, or continuing education opportunities, as a result of that public disclosure. Plaintiff has not pleaded or proved that he has lost any tangible opportunities. Such potential future harms do not satisfy the "stigma plus" doctrine. *Cf. Purdue Univ.* 928 F.3d at 662-63 (stigma plus doctrine available where Purdue's disclosure to the Navy damaged plaintiff's "occupational liberty," by terminating his chances to pursue Navy career); *see also* SJ Order, *Doe v. Bd. of Trustees of the Univ. of Ill.*, cause no. 17-cv-2180 (C.D. Ill. July 24, 2018), ECF#54 p. 19 (granting summary judgment because

"Plaintiff cannot show that Defendant ever publicly disclosed his disciplinary record, and, even more importantly, he admits that he never actually completed and submitted an application to any other school, and that said school rejected him because of his disciplinary record") (Ex. B).

      c.    *Plaintiff's speculative future harm would come entirely from his public sex crime charge, which the University has no control over or involvement in.*

Plaintiff invokes the specter of future college, graduate school, or employment applications where he might be required to disclose his educational background, and might be required to disclose his prior conduct history with the University.

Even if such future speculative harm were actionable, Plaintiff has provided no explanation for how his requested injunction would solve his problem. Every theoretical future application Plaintiff will fill out that would request information regarding his University disciplinary record would almost certainly also seek information regarding whether he had ever been charged with a crime, particularly with a felony or a sex crime. Until Plaintiff is found not guilty, and until he takes the further step of expunging the charge from his record, there is likely no application where his conduct history with the University would hinder his success, but his felony charge would not. *Cf. Purdue Univ.*, 928 F.3d at 652–70 (sexual assault determination made solely within university, no mention of public sex crime charge).

Just as Plaintiff has no property interest to assert in this case, he also has no cognizable liberty interest. But even if Plaintiff amended his pleadings or found evidence to support either a property or liberty interest, his due process claim still fails, as the University's Hearing complied with all obligations imposed by the due process clause.

**(3)**    **Even if Plaintiff had plausibly pleaded (or proved) a cognizable property or liberty interest, his due process claim fails because the University provided him a meaningful opportunity to be heard.**

Assuming for argument's sake that Plaintiff has a viable interest that implicates the due process clause, the University satisfied all obligations imposed by the Constitution. The University's

process upon learning that Plaintiff possibly committed a felony sex crime—(i) summary suspension, (ii) immediately scheduling a Hearing for Plaintiff, (iii) holding a two-hour long Hearing during which the University allowed Plaintiff to respond to the disciplinary charges and call witnesses, (iv) permitting an appeal—was completely reasonable under the circumstances and far more than is required to satisfy due process.

a.   *The University's summary suspension, combined with a Hearing scheduled one day later, and a Hearing within four days, comports with due process*

Upon learning that Plaintiff had a pending felony sex crime charge, the University issued a summary suspension letter. Plaintiff's Complaint does not focus on that initial finding, or allege that it violates due process, and rightly so. Summary deprivations are permissible so long as the state quickly allows the deprived person an opportunity to be heard. *Barry v. Barchi*, 443 U.S. 55, 64 (1979) (summary suspension appropriate response to allegation of horse doping, when followed by hearing on the same); *Medlock v. Trustees of Ind. Univ.*, 738 F.3d 867, 871 (7th Cir. 2013) (due process does not require pre-deprivation hearing for suspension). Indeed, an arrest warrant is by itself "compelling evidence" from which a university can preliminarily determine that the student is responsible for the crime and poses a threat, which justifies summary action. *Hess v. Bd. of Trustees of S. Ill. Univ.*, 839 F.3d 668, 674 (7th Cir. 2016) ("an arrest warrant for aggravated battery was compelling evidence that Hess may have been responsible for the stabbing of Aaron Franks—permitting SIU, in the interest of protecting other members of its community, to promptly remove Hess from campus pending a later hearing.")

Plaintiff suggests he did not have enough time to prepare for the Hearing, but Plaintiff requested an expedited Hearing and then agreed to the date and time. He also provides no explanation for how he was prejudiced. He had time to retain counsel who assisted him at the Hearing, prepare a written opening and closing statement, and to call his alibi witness. He makes no suggestion that there were other witnesses he would have called, or other evidence he would have

presented. Indeed, it would have been *more* prejudicial to summarily suspend him, but then to elongate the time before he could have a Hearing. Scheduling the Hearing as quickly as possible *minimized* the prejudice to Plaintiff, and provides no support for Plaintiff's argument.

Plaintiff also complains that the University did not create an investigatory report. But Plaintiff's felony charge and subsequent arrest are themselves "compelling evidence" from which the University could take summary action to protect the campus. *Hess*, 839 F.3d at 674. Plaintiff's notion that state actors must first create a full-length investigatory report would make it impossible to act summarily in response to threatened harm. Further, for the reasons explained above, it would have been unwise, if not impossible, for the University to insert itself into a pending criminal case involving an anonymous minor accuser. Plaintiff's focus on "investigatory reports" appears to invoke one of the issues in in *Purdue Univ.*, 928 F.3d at 657, but the issue there was that the university created its own investigatory report, and then presented it to Purdue John just minutes before his hearing; thus, Purdue John was fighting blind against the accusations made against him. Here, Plaintiff had full notice of all charges against him, and the University did not spring any issue on him at the last minute. The fact that Plaintiff made his presentation on a largely open record was to his benefit, not his detriment.

> b. *The Hearing itself comported with due process, since Plaintiff was given a meaningful opportunity to be heard.*

The due process rights of students facing discipline in an educational setting are not the same as those afforded to defendants in a criminal or quasi-criminal setting. *See Linwood v. Bd. of Educ. of the City of Peoria*, 463 F.2d 763, 770 (7th Cir. 1972) ("an expulsion hearing need not take the form of a judicial or quasi-judicial trial," and due process in the context of an expulsion hearing "is not to be equated…with that essential to a criminal trial or juvenile court delinquency proceeding"); *see also Foo vs. Ind. Univ.*, 88 F. Supp. 2d 937, 948–49 (1999).

All that is required was "some kind of notice" and "some kind of hearing." *See Goss v. Lopez*,

419 U.S. 565, 578 (1975); *Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 86 (1978) ("[a]ll that *Goss* required was an informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context") (internal punctuation omitted); *accord Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1205–08 (S.D. Ind. 2016). Plaintiff's counsel attended the Hearing via phone, which also comports with the law. *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) (finding it "arguable" that a student facing criminal charges can "consult" a lawyer, but that there is not a right to have the lawyer participate directly).

In short, the two-hour-long Hearing conducted by the University, where Plaintiff in consultation with his counsel, was able to respond to the misconduct charges, characterize his conduct, and put it in the context he deemed proper, unequivocally satisfies all applicable due process strictures, particularly when coupled with Plaintiff's right to appeal the commissioners' decision to Provost Robel, who provided another layer of process.

    c.    *The commissioners' determination was not preordained; rather, they came to the determination that Plaintiff and his sister's story was false, which by itself tends to prove Plaintiff's culpability.*

To get around the undisputed facts that the University gave him both notice and a two-hour-long Hearing where he presented a statement and called alibi witnesses, Plaintiff declares the Hearing "a sham." *See Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016) ("a hearing must be a real one, not a sham or pretense."). Plaintiff's argument that all of the individual defendants were acting in bad faith, and were predetermined to suspend him without regard to the truth, should be presumed wrong, and Plaintiff has not carried his heavy burden to rebut that presumption. *Hess*, 839 F.3d at 675 ("we presume that administrators are honest and impartial, and therefore capable of judging a particular controversy fairly on the basis

of its own circumstances" (cleaned up)). No factual allegation plausibly supports Plaintiff's con-clusory "sham" allegation; the evidentiary record fully disproves it.

As recounted in detail above, Plaintiff was given substantial latitude to tell his side of the story. For the reasons discussed, his story simply made no sense. The siblings' utterly implausible story, combined with the inconsistencies between them, led the commissioners to find it more likely than not that the incident giving rise to the criminal charges took place. Finders of fact are entitled to make such determinations when confronted with palpably false statements aimed at exoneration. *Wilson*, 162 U.S. at 620–21; *United States v. Karigiannis*, 430 F.2d 148, 151 (7th Cir. 1970) ("False exculpatory statements may, of course, be considered by the jury in determin-ing guilt"); *Matthew v. State*, 337 N.E.2d 821, 824 (Ind. 1975) ("'Where a person is accused of crime, a guilty consciousness may be inferred from attempted evasion, palpable falsehood, equivocation, or from suppression of facts, and a presumption of guilt is said to arise from the falsification of testimony by accused.'" (quoting 22A C.J.S. Criminal Law § 596, at 375–376 (1961)).

The palpable falsehoods strewn throughout Plaintiff's story were more than sufficient to provide a non-arbitrary, rational basis supporting the commissioners' decision. *See McDonald v. Bd. of Trs. of Univ. of Ill.*, 375 F. Supp. 95, 102–03 (N.D. Ill. 1974) (a disciplinarian's findings must be sustained where supported by "some," but not necessarily substantial, evidence), *aff'd and adopted by McDonald v. Bd. of Trs. of Univ. of Ill.*, 503 F.2d 105 (7th Cir. 1974). No doubt, Plaintiff wishes the commissioners and Provost Robel had believed his story, but a disagreement over the ultimate outcome does not provide Plaintiff with any legal claim. *Hess*, 839 F.3d at 678 ("The Fourteenth Amendment is not a vehicle for re-litigating in federal court evidentiary ques-tions arising in school disciplinary proceedings, or for correcting a university's allegedly bad de-cision-making.")

d. *No binding case supports Plaintiff's claimed right to cross-examine Girl 1 at the Hearing; and in the circumstances of this case, it would have been largely impossible if not illegal to provide such an opportunity.*

Plaintiff claims that more than 25 courts have held that accused students have a right to cross-examination in Title IX disciplinary proceedings involving "he-said/she-said" allegations. (DE #3, ¶ 127.) None of those 25 cases are from or within the Seventh Circuit. (*Id.*) And here, the University did not conduct a Title IX disciplinary hearing; it invoked its summary suspension proceedings.

But further, Plaintiff has provided no explanation for how the University could procure the presence of a minor child, particularly while a no-contact order entered by a state trial court forbids Plaintiff from communicating with Girl 1. To this day, her identity is protected from the University by Indiana's criminal procedure laws, which shield the name of alleged victims of sex crimes.

Assuming that Plaintiff has satisfied the first step in the due process analysis, the Court's second inquiry is "what process is due *under the circumstances*." *Charleston*, 741 F.3d at 772 (emphasis added). Under the circumstances here, the due process clause unquestionably does not mandate that the University procure Girl 1's presence at the Hearing, while a state court's no-contact order (not to mention the Class A Misdemeanor enacted by Indiana's legislature, Ind. Code § 35-46-1-15.1(a)) simultaneously forbids it.

**C. Assuming the Plaintiff faces some risk of harm from not being able to take advantage of other educational opportunities, all such harm comes from his public felony sexual misconduct charges, not from the University.**

The University recognizes that in circumstances not presented here, courts have acknowledged a student's concern that he will not be able to get into another college after being expelled for a disciplinary matter. *E.g., Marshall*, 170 F. Supp. 3d at 1206 (noting party's argument "that expulsion from a state university system has serious and long-term economic consequences," before dismissing his due process claims); *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM,

2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) ("Plaintiff would have to explain, for the re-
mainder of his professional life, why his education either ceased prior to completion or contains
a gap").

Such concerns carry less weight here. Even if this Court granted Plaintiff the extraordinary
relief of a mandatory injunction, in an effort to erase the alleged "stigma" of an adverse discipli-
nary finding, Plaintiff still faces a public sex crime prosecution. That public record is much more
likely to create the speculated future harms Plaintiff predicts than the University's private disci-
plinary action, particularly if the case ends with a guilty verdict or a plea deal. Put differently, it
makes little sense to preliminarily order the University to undo its disciplinary action, allegedly
saving Plaintiff from the irreparable harm of "stigma," when the only stigma presently attached
to Plaintiff comes from the publicly-filed felony sex crime charge. This Court should decline to
afford Plaintiff this largely ineffectual injunctive relief.

## III. Even if Plaintiff could make these threshold showings, his injunctive relief must still be denied: a mandatory injunction would impose serious harm on the University; and would threaten the public's interest in an orderly criminal justice system.

Given Plaintiff's extremely low to non-existent likelihood of success on the merits, the Sev-
enth Circuit's sliding scale approach instructs that Plaintiff must make an even greater showing
regarding the remaining elements of balancing the harms and protecting the public interest.
*Turnell*, 796 F.3d at 662. Plaintiff cannot make that heightened showing.

### A. Injunctive relief threatens the University with substantial harm: the University has an interest in vindicating the process it uses to protect its student population from individuals who may have committed sexual assault.

As discussed above, the commissioners rationally concluded by a preponderance of the evi-
dence—based on the palpably false and inconsistent story provided by Plaintiff and Sister, *see
Matthew*, 337 N.E.2d at 824—that Plaintiff may have committed a sex crime, or at least that he

posed a safety risk to the campus population. An independent third-party, the state prosecutor, found probable cause to believe that Plaintiff committed a felony sex crime during the events Plaintiff and Sister recounted. And another third-party independent of both the University and the prosecutor, the state trial court, agreed when it issued an arrest warrant.

In weighing the balance of harms, this Court must "seek[] at all times to minimize the costs of being mistaken." *Stuller, Inc.*, 695 F.3d at 678. Here, the cost of mistakenly granting Plaintiff's injunction would be to reinsert an individual potentially guilty of a felony sex crime, against a sleeping minor, among the University's student population, thereby jeopardizing their health, safety, and security. Further, it remains possible that Plaintiff will be found guilty at his criminal trial—currently scheduled to take place a month-and-a-half from now—at which point Plaintiff would again be removed from campus, either because he could be imprisoned or would be summarily suspended again. In that event, granting Plaintiff's TRO will mean the expenses the University incurs in re-enrolling Plaintiff and catching him up with the Spring classes he is presently missing will be completely wasted.

In contrast, the cost of mistakenly denying Plaintiff's injunction would be that Plaintiff would have an opportunity to focus on his criminal trial, presently scheduled for March, where if he succeeds in clearing his name, it is completely possible that he could resume his education as early as the summer session.

Granting Plaintiff's injunction would also impose serious harm by way of invalidating the University's procedures followed here, which the University has an interest in vindicating. *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *14 (S.D. Ind. Aug. 22, 2014) ("A win by DePauw would vindicate its policies and its process in this case."). That interest is particularly salient in this case, where it is not clear what more the University could have done to investigate the potential fact of Plaintiff being a felony sex offender. The University did

not take its initial summary suspension action based on a rumor or an unsubstantiated accusation; rather, the University took that step after learning that a prosecutor had charged Plaintiff with a felony, a decision that the prosecutor could only lawfully or ethically take if he believed the charges were true. *Hess*, 839 F.3d at 674 (university may treat arrest warrant as "compelling evidence" that individual may be responsible for a crime). As Libby Spotts pointed out at the beginning of the Hearing, the charge is particularly worrying because Plaintiff allegedly attacked a sleeping victim, and the University houses thousands of young adults sleeping in close proximity to one another in dormitories.

At the University's Hearing, Plaintiff presented evidence and called witnesses to explain his side of the story, and attempted to convince the commissioners that the felony sex crime charge was false. The University also allowed him to submit a lengthy appeal to Provost Robel, another layer of procedural checks. Short of the University inserting itself into an ongoing criminal matter, regarding events taking place hundreds of miles away, it is not clear what more process the University could have provided in these circumstances.

An adverse ruling on this TRO would have ramifications far beyond Plaintiff's case. In any case where a student is accused of committing an off-campus felony sex crime against a minor, who is not a university student, there will likely be a similar no-contact order, and the minor victim's identity will be anonymous. Thus, granting Plaintiff's injunction would effectively make it impossible for similarly situated institutions to ever take a disciplinary action against a student accused of committing a similar off-campus crime, since it would never be practical (and may even be impossible or illegal) for the University to compel the presence of the minor victim for cross-examination. The only alternative to making it impossible to suspend students charged with an off-campus felony sex crime against a minor would be for the University and similarly

situated educational institutions to first interfere intolerably with the ongoing criminal proceedings by conducting a full-blown intrusive, parallel investigation, which is simply not feasible.

**(1)**     *Additionally, the particular injunctive relief Plaintiff requests would impose serious costs on the University*

Beyond vindicating the process used here, to which Plaintiff has not offered a plausible alternative, the Court should deny Plaintiff's particular injunctive requests, which would impose serious costs on the University.

Plaintiff requests a mandatory injunction allowing him to "complete his Fall 2019 term course work." (DE #1, p. 1.) It is not clear what exactly Plaintiff has in mind, but the professors who taught his Fall 2019 classes are presently teaching their Spring 2020 classes. It would impose a serious cost on the University's professors to force them to find a way for Plaintiff to satisfy course requirements, including any final exam or other assessments, for their now-finished fall 2019 term, particularly given that they have already started teaching their Spring 2020 term. *Cf. Univ. of Notre Dame*, 2017 WL 1836939, at *12 ("An injunction requiring a university to allow a student to return for an entire school year strikes me as a much greater burden to the university than what is being requested here—the taking of two final examinations.").

Plaintiff also asks for the Court to rule that "defendants must offer John a new disciplinary proceeding free of the ... constitutional violations addressed in this Complaint." (DE #1, pp. 1–2.) As Plaintiff repeatedly states, this means he wants the Court to order the University to redo the Hearing and to procure the presence of his minor accuser so that he can cross-examine her. (DE #2, pp. 3 (arguing that the University's procedure was deficient "because IU and the individual defendants ... denied John the opportunity to cross-examine or confront his accuser by failing to secure her testimony".)

As explained above, the no-contact order entered in Plaintiff's criminal case forbids him from having contact with Girl 1, including "through intermediaries," which would presumably

also rule out Plaintiff submitting questions for the commissioners to ask Girl 1. Thus, granting Plaintiff's request would put the University at loggerheads with the criminal court's order.

## B. The public interest would be served by not forcing similarly situated universities to interfere in an ongoing criminal matter

For these same reasons, granting Plaintiff's injunction would greatly disserve the public interest, because the public has an interest in letting the pending criminal case play out without interference from the University. Whether Plaintiff has any right to cross-examine or contact Girl 1 in advance of his March trial should be decided solely on the basis of Indiana's criminal procedure laws; Plaintiff should not be given an end run around those procedures, which he would accomplish if his TRO is granted. The public interest would also be disserved if its premier state institution of secondary education is not permitted to take the reasonable steps taken here to promote campus safety.

In contrast, the public interest *will* be served by upholding Plaintiff's suspension, giving him time to focus on his upcoming criminal trial in March 2020. If that trial and associated factual development clears Plaintiff of wrongdoing, it is entirely possible that the University or another university would accept him as a student, which could take place as early as the 2020 summer session.

## C. Insofar as the Court considers granting Plaintiff's requested relief, it should come with a large bond.

Federal Rule of Civil Procedure 65(c) provides, "The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added). If the University is enjoined, but the Court later determines that injunction to be wrongful, the University faces substantial costs and damages. In particular, if it is true that Plaintiff is a felony sex offender—as rationally found by

a preponderance of the evidence by the commissioners, and as believed by the state prosecutor—and if Plaintiff reoffends in a similar manner on campus, the University will face massive damages liability from those potential victims.

In the event the Court gives any credence to Plaintiff's mandatory injunctive request, the University respectfully requests that the Court order Plaintiff to secure that injunction with a commensurate bond in the amount of $700,000 (the damages cap from Indiana's Tort Claims Act).

## Conclusion

Once informed that the state of Indiana had charged a student on its campus with a felony sex crime against a sleeping victim, the University behaved reasonably under the circumstances. The summary suspension procedure is a necessary and constitutionally-sound option for universities entrusted with protecting the safety of their students. The quickly scheduled Hearing, where the University gave Plaintiff a meaningful opportunity to be heard regarding the charges at issue, complied fully with all requirements of due process.

Granting Plaintiff's requested injunction would not only impose immediate costs on the University in terms of campus safety, it would also impose long term harm on the University and similarly situated educational institutions that rely on identical or similar procedures to balance the interests between campus safety and the individual rights of students accused of criminal conduct. Since there is no emergency, this case should be litigated on a standard timeframe, which would also give time for Plaintiff's criminal case to develop and go to trial.

Respectfully submitted,


/s/ Tracy N. Betz
Michael C. Terrell, Atty. # 2124-49
Tracy N. Betz, Atty. # 24800-53
Vivek R. Hadley, Atty. # 32620-53
Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023
(317) 713-3500
(317) 713-3699 (fax)
mterrell@taftlaw.com
tbetz@taftlaw.com
vhadley@taftlaw.com
*Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was filed via the Court's electronic filing system on February 3, 2020, which will provide service upon all counsel of record.


/s/ Tracy N. Betz