UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00123-JRS-DML |
| | ) | |
| TRUSTEES OF INDIANA UNIVERSITY, | ) | |
| LAUREN ROBEL, | ) | |
| KATHY ADAMS-REISTER, | ) | |
| LIBBY SPOTTS, | ) | |
| ROBERT BILLINGHAM, | ) | |
| MICHAEL COURTNEY, | ) | |
| GRANT VOGTMAN, | ) | |
| | ) | |
| Defendants. | ) | |

**Entry and Order on Defendants' Motion to Dismiss (ECF No. 46)**

Indiana University suspended Plaintiff John Doe ("John") after finding him guilty of sexual misconduct against a non-student minor.  John brought suit against the Trustees of Indiana University, Provost Lauren Robel, Title IX Deputy Coordinator and Director of the Office of Student Conduct Libby Spotts, and IU Hearing Commission members Robert Billingham, Michael Courtney, and Grant Vogtman (collectively "IU," "University," or "Defendants") under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, alleging a deprivation of procedural due process.  Defendants moved to dismiss.  (ECF No. 46.)  For the following reasons, the Court dismisses John's suit without prejudice.

## I.    Standard of Review

1

A complaint must contain a short and plain statement showing that the pleader is entitled to relief. *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "To meet this standard, a plaintiff is not required to include 'detailed factual allegations,'" but the factual allegations must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

When considering a motion to dismiss for failure to state a claim, courts "take all the factual allegations in the complaint as true," *Iqbal*, 556 U.S. at 678, and draw all reasonable inferences in the plaintiff's favor, *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). Courts, however, need not accept the truth of mere legal conclusions. *Iqbal*, 556 U.S. at 678–79. "[I]f a plaintiff pleads facts that show its suit [is] barred . . . it may plead itself out of court under a Rule 12(b)(6) analysis." *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995) (citation omitted).

## II.    Background

John Doe began his freshman year at Indiana University-Bloomington in September of 2019. (Compl. ¶ 3, ECF No. 43.) He planned to work toward eventually obtaining a Master of Business Administration (MBA) degree. (*Id*. ¶ 44.)

Soon after beginning classes, John was criminally charged with felony sexual misconduct against a sleeping minor, Jane Doe, and a warrant issued for his arrest. (*Id*.

¶ 45.)  In October, an online news website reported on John's arrest and the sexual misconduct charge.  (*Id*. ¶ 5.)

In early November, the University first learned of John's arrest through the article.  (*Id*. ¶¶ 6–7.)  On November 11, based on the article, Title IX Deputy Coordinator and Director of the Office of Student Conduct Libby Spotts notified John that IU was summarily suspending him for violating IU's Code of Student Rights.  (*Id*.)  The suspension would last one year at minimum.  (Ex. 1 at 1, ECF No. 43-1.)  The notification letter sent to John stated that Jane had alleged that John sexually assaulted her while she was visiting John's sister on July 4, 2019.  (*Id*.)  Jane said she had fallen asleep at an off-campus residence and woke to find John's hands down her pants; she fell back asleep and woke again to find her pants off and John attempting to have sex with her.  (*Id*.)  Consequently, IU said, John posed a "serious threat of harm to [him]self and/or others on the campus."  (Compl. ¶¶ 6–7, ECF No. 43.)  IU's summary suspension procedure permits the Provost to act without following normal procedures if she is "satisfied that the student's continued presence on the campus constitutes a serious threat of harm . . . ."  (Ex. 1 at 2, ECF No. 43-1.)  John requested a formal hearing reviewing the summary suspension decision before the University Hearing Commission, comprised of Defendants Robert Billingham, Michael Courtney, and Grant Vogtman.  (Compl. ¶ 8, ECF No. 43.)  Spotts contacted John to schedule the hearing the next day.  (*Id*. ¶ 55.)

IU conducted the hearing on November 15. (*Id.* ¶ 9.) Minutes before it began, John reviewed IU's case file, which contained only his correspondence with the University and the docket from his pending criminal case. (*Id.* ¶ 73.) At the hearing itself, IU called no witnesses and presented no documents. (*Id.* ¶ 75.) But John and his sister testified, presenting a different story than the one Jane told police. They confirmed that Jane had visited John's sister on July 4, 2019, and that Jane had spent time in John's room. (*Id.* ¶ 66.) But John and his sister testified that John's sister was also present, so John was never alone with Jane and was never physically in a position to sexually assault her. (*Id.* ¶¶ 68–71, 80–81.) John and his sister also testified that Jane had exhibited "odd behavior" that afternoon when she was caught by John and his sister with her pants down, apparently peeing in a garbage can in the corner of the room. (*Id.* at ¶ 72.) John and his sister testified that they believed Jane was "humiliated," and that none of the three ever spoke of the matter again. (*Id.* ¶ 72.) While John's sister was testifying, a commissioner asked her about Jane's possible motive for making a false accusation, but Spotts interjected and instructed the sister not to answer, reasoning that Jane was not available to rebut the sister's testimony. (*Id.* ¶ 103.) At the end of the hearing, Spotts identified the following as evidence in the record: John's testimony, his sister's testimony, the charges filed against John, and an online news report about John's arrest. (*Id.* ¶ 77.) At no point did IU speak with Jane or ask her to provide a statement. (*Id.* ¶¶ 14, 93–97, 106.) In total, the hearing lasted about two hours. (*Id.* ¶ 75.)

4

On November 18, the Hearing Commission notified John that it had found him responsible for personal misconduct by a preponderance of the evidence and would uphold his summary suspension. (*Id.* ¶¶ 78–79.) John appealed. (*Id.* ¶ 83; Ex. 3, ECF No. 43-3.) Provost Lauren Robel affirmed the suspension, citing the criminal charge against him in support. (Ex. 4 at 1, ECF No. 43-4.)

John remains suspended, but events after the Commission's decision are relevant. On February 17, 2020, John entered into a pre-trial diversion program under Indiana Code § 33-39-1-8(d). (Ex. 6, ECF No. 43-6.) Through the program, the prosecutor agreed to dismiss the charge against John on May 17, 2020. (*Id.*) The agreement prohibits John from contacting Jane for eighteen months from the date of signing, (*id.*), extending on a state judge's no-contact order from September 26, 2019, (ECF No. 41-3). And, although he wants to return to IU, John applied to transfer to Purdue "in an effort to mitigate his damages during the pendency of this action." (Compl. ¶ 112, ECF No. 43.) He was obligated to report and did report the existence of IU's disciplinary action in the application. (*Id.* ¶ 112.)

John sued the Trustees, the commissioners, Spotts, and Robel under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, alleging that they deprived him of procedural due process at his disciplinary hearing. John seeks injunctive relief, including reinstatement as a student at IU, a new and procedurally proper hearing, expungement of his records at IU of any information related to the disciplinary hearing, and rescission of any failing grades stemming from the suspension. (*Id.* at 40.) He also asks the Court to enjoin Defendants from enforcing any associated discipline and sanctions and from

5

subjecting him to further improper disciplinary proceedings.  (*Id*. at 42.)  Defendants moved to dismiss.  (ECF No. 46.)

## III.   Discussion

The Due Process Clause guarantees certain procedures when a state actor deprives someone of "life, liberty, or property."  U.S. Const. amend. XIV, § 1.  Because John has not adequately pleaded a deprivation of any of those three interests, John fails to state a claim.

*A. John has failed to plausibly allege that his liberty interest was deprived.*

Defendants argue that no cognizable liberty interest is at stake in this case, but John maintains that the University deprived him of his occupational liberty to pursue a career in business management.[1]  (Compl. ¶ 44, ECF No. 43.)  To state a claim under this theory, known as the stigma-plus test, John must allege (1) that the state disclosed information that damaged his reputation, (2) that the reputational harm made it "virtually impossible" for him to find employment in his chosen profession, and (3) that his legal status was altered, depriving him of a previously held right.  *See Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) (citations omitted).

1.   John has failed to plead state disclosure.

The first prong of state disclosure roughly corresponds to the publication requirement of defamation law.  Just as self-defamation is not actionable, self-publication of

---

[1] By failing to respond to Defendants' relevant argument, John concedes that this case implicates no property interest.  *See Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013) (reaffirming that the Seventh Circuit does not recognize a stand-alone property interest in higher education at a state university).

harmful material is inadequate to establish a liberty interest—"a plaintiff can't himself spill the beans and then blame the defendant for ruining his reputation." *Purdue*, 928 F.3d at 661 (citing *Olivieri v. Rodriguez*, 122 F.3d 406 (7th Cir. 1997)). The publication requirement of the stigma-plus test is met when disclosure of damaging information is (1) "compelled," (2) "certain," and (3) "not self-published." *Purdue*, 928 F.3d at 662. Notably, dissemination by the defendant and *not* by the plaintiff is a strict requirement in stigma-plus claims in the Seventh Circuit. *See Olivieri*, 122 F.3d at 408–409 (explicitly rejecting the approach of other circuits that allow plaintiffs to establish stigma-plus claims via self-publication); *Johnson v. Martin*, 943 F.2d 15, 16–17 (7th Cir. 1991) (same).

Two examples cited in *Purdue* are illustrative. In *Olivieri*, the plaintiff probationary officer was fired for sexually harassing female probationers, and he sued his superintendent on a stigma-plus theory. 122 F.3d at 407. Although the superintendent had never publicly disclosed the grounds for discharge, the plaintiff argued that he would inevitably have to disclose the reasons for his discharge in future interviews with police departments. *Id.* at 408. But the Seventh Circuit rejected his theory because the plaintiff's honest disclosure does not meet the requirement of dissemination by the defendant. *Id.* at 408–409. On the other hand, in *Dupuy v. Samuels*, the plaintiffs were legally obligated to authorize a state agency to disclose to current and future employers a finding that the plaintiffs were child abusers—the panel held that this scenario, in which the state did the disclosing, satisfied the publication component of the stigma-plus test. 397 F.3d 493, 510 (7th Cir. 2005). Likewise, in *Purdue*,

7

the plaintiff was legally obligated to authorize Purdue University's disclosure of the plaintiff's disciplinary record to the Navy. 928 F.3d at 662. In both *Dupuy* and *Purdue*, the state—not the plaintiff—disseminated the defamatory information.

In contrast, John has not pleaded state disclosure. John alleges that *he* would be obligated to disclose his disciplinary record if and when he applies to an MBA or other graduate-school program. (Ex. 5 ¶¶ 13–14, ECF 43-5 ("*John* will face a legal obligation to disclose—often under penalty of perjury—IU's disciplinary action. . . . Most schools impose *on the applicant* a legal obligation to disclose sexual misconduct disciplinary actions." (emphases added))). Additionally, John alleges that *he* was legally obligated to disclose his disciplinary record in his transfer application to Purdue. (Compl. ¶ 112, ECF No. 43 ("The transfer application John submitted to Purdue required that *John* report the existence of IU's disciplinary action, which he has done." (emphasis added))). Read in the light most favorable to John, neither allegation is adequate to fulfill the dissemination requirement of the stigma-plus test; although John has alleged that *his own* disclosure was certain and compulsory, he has not alleged that *IU* has ever disseminated his disciplinary record. John's case is therefore closer to *Olivieri* than *Dupuy* or *Purdue*.

John's brief opposing Defendant's motion to dismiss simultaneously relies intrinsically on *Purdue* and ignores that decision's reiteration that self-publication cannot form the basis of a stigma-plus claim. *See Purdue*, 928 F.3d at 662 ("Purdue, *not John*, revealed to the Navy that it had found him guilty of sexual violence . . . ." (emphasis added)). To avert dismissal on the self-publication ground, John points to a

8

recent case from the Northern District of Indiana, *Doe v. Purdue Univ.*, No. 4:19-CV-56-TLS-JPK, 2020 WL 2839177 (N.D. Ind. June 1, 2020).  There, the plaintiff was expelled from a state university after a negative sexual misconduct determination, and he brought a stigma-plus claim under § 1983.  *Id.* at *1.  Although the plaintiff only alleged an obligation to self-report his disciplinary record to graduate schools and licensing boards—not alleging that the state would disclose such information—the court found that he had stated a claim under the stigma-plus test.  *Id.* at *8.  The Northern District of Indiana court seemingly did not consider the dissemination element of the stigma-plus test, as its opinion does not mention that rule or discuss the operative cases.  Consequently, that decision does not persuade the Court in this case. In any event, that decision is not binding here, whereas Seventh Circuit precedent, requiring state disclosure, is.

Because John has failed to plead that IU disseminated stigmatizing information, he fails to state a claim.[2]

 2. John has adequately pleaded that IU's disciplinary finding will make it "virtually impossible" for him to find a job in his chosen career.

Under the second prong of the stigma-plus test, John must show that his "good name, reputation, honor or integrity [were] called into question in a manner that makes it virtually impossible for the employee to find new employment in his chosen field."  *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001).  The level of stigma must cause a "tangible loss of other employment opportunities" or "have the effect of

---

[2] Taking for granted that John can plead facts to cure this defect, the Court will address the remaining issues in this motion for efficiency's sake.

blacklisting" the plaintiff from comparable jobs.  *Id*. (internal quotation marks and citations omitted).

Defendants argue that John has failed to allege that IU's finding of sexual misconduct foreclosed his career opportunities.  Specifically, Defendants maintain that an alleged loss of higher education opportunities—like the MBA John hopes to obtain, (Compl. ¶ 44, ECF No. 43)—is insufficient.  They argue that John needs to further allege a particular lost opportunity in the field of business.  In contrast, John believes that his allegation of a lost opportunity to obtain an MBA is sufficient without any further allegations of loss within a "discrete field of employment."  (Pl.'s Opp. Defs.' Mot. Dismiss Am. Compl. at 13, ECF No. 48.)  John says that his being blacklisted from graduate business schools necessarily precludes his chosen business career, even if that career is far in the future.

The dispute here revolves around how much attenuation between discipline and negative employment consequences the phrase "virtually impossible for the employee to find new employment in his chosen field" allows.  John has pleaded that his inability to get an MBA, owing to stigma, would make it virtually impossible to enroll in a reputable graduate school.  (Ex. 5 ¶ 16, ECF No. 43-5; Compl. ¶ 152, ECF No. 43.)  In turn, John's career of choice would be unavailable, as John's brief further indicates that a graduate MBA degree "is a necessary predicate to a career in higher-level business management."[3]  (Pl.'s Opp. Defs.' Mot. Dismiss Am. Compl. at 14, ECF No. 48.)

---

[3] Although this fact was set forth in the briefs and not the pleadings, the Court will consider it because it is consistent with the amended complaint.  *See, e.g., Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013).

That proposition may eventually be proven wrong—for example, many companies employing higher-level business managers may prefer their own post-graduate training programs to an MBA program. But the Court nevertheless finds that these alleged facts plausibly show at this early stage of litigation that John's intended career in higher-level business management is essentially foreclosed.

      3. <u>John has sufficiently alleged that his legal status was altered.</u>

Finally, to state a stigma-plus claim, John "must also show that the stigma was accompanied by a change in legal status." *Purdue*, 928 F.3d at 662. In *Purdue*, the panel found that the state university changed the plaintiff's legal status when it suspended him, subjected him to readmission requirements, and caused the loss of his Navy ROTC scholarship. *Id.* at 661. The same is true here. After an official determination of guilt, IU suspended John for at least twelve months. (Compl. ¶ 38, ECF No. 43.) To be reinstated, John must meet several conditions. (Ex. 4 at 1, ECF No. 43-4.) IU barred John from entering any IU campus or participating in IU programming. (*Id.* at 2.) And John has "most likely lost the benefit of the scholarships and financial aid" he previously had access to. (Compl. ¶ 110, ECF No. 43.) John has therefore sufficiently alleged that he suffered a change in legal status due to IU's conduct.

      B. *Assuming he could plead that IU divested his liberty interest, John has plausibly pleaded that IU afforded him inadequate process.*

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). In the school

disciplinary context, as in others, the requisite procedures are "context-specific." *Purdue*, 928 F.3d at 665 (citing *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978)).  The higher the education level, the more procedure a student is entitled to.  *See Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 663–64 (7th Cir. 2004).  And, a university must provide stronger safeguards where more severe consequences are at stake, such as longer-term suspensions or expulsions.  *See Purdue*, 928 F.3d at 665 (citing *Goss v. Lopez*, 419 U.S. 565, 584 (1975)).

Two features that render a hearing like John's inadequate emerged from *Purdue*. First, the state university cannot withhold evidence.  *Purdue*, 928 F.3d at 663 ("[W]ithholding the evidence on which [the University] relied in adjudicating [John's] guilt was itself sufficient to render the process fundamentally unfair.") (citing *Goss*, 419 U.S. at 580).  Second, the "'hearing must be a real one, not a sham or pretense.'" *Purdue*, 928 F.3d at 663 (quoting *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016)).  Specifically, the *Purdue* panel found two circumstances indicating that the result of the hearing was predetermined, or a "sham": (1) two of Purdue's three commissioners did not read the investigative report containing inculpatory evidence, but they found the plaintiff guilty anyway; and (2) the Purdue commissioners announced adverse credibility conclusions against the plaintiff and positive credibility conclusions as to the accuser without ever evaluating her by testimony, judging a written statement, or hearing specific impeachment evidence proffered against the accuser.  928 F.3d at 663–64.

John has not pleaded facts showing that IU withheld evidence at his hearing. However, John does claim that the hearing was a "sham." (Compl. ¶¶ 12, 14, 92, 95, 167, ECF No. 43.)  In support of his allegation that the hearing was predetermined, John specifies that IU (1) failed to conduct any investigation, (2) failed to present inculpatory evidence, (3) ignored exculpatory evidence, (4) denied him the opportunity to present impeachment evidence, and (5) unjustifiably believed the absent accuser over John.  (*Id*. ¶ 12.)  Furthermore, John asserts that he had a right to cross-examine his accuser, (*id*. ¶ 132), an undecided issue in the Seventh Circuit.

Points (1) and (2) boil down to an attack on the evidentiary rules IU used.  Namely, John believes that IU could not consistent with due process find him guilty based only on an arrest warrant issued against him for felony sexual assault of a minor.[4]  (*Id*. ¶ 141; Pl.'s Opp. Defs.' Mot. Dismiss Am. Compl. at 23, ECF No. 47.)  In support of that proposition, John cites language in *Purdue* warning universities not to find students "guilty based on the accusation rather than the evidence."  928 F.3d at 663.  But "accusation" in *Purdue* refers to Jane Doe's bare complaint to the university, not a formalized finding of probable cause.  Indeed, *Purdue* did not disturb caselaw finding an arrest warrant to be "compelling evidence" that could at least justify a suspension without a pre-deprivation hearing.  *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d at 668, 674 (7th Cir. 2016).  And while the arrest warrant in John's case arose in the context

---

[4] John attempts to frame his objection to the admissibility of the arrest warrant as an issue of the University failing to conduct "any investigation" into his wrongdoing.  (Compl. ¶ 98, ECF No. 43.) But what he really questions is whether IU could properly find him guilty while relying primarily on the arrest warrant as inculpatory evidence.  This is a challenge to the admissibility and weight of the warrant as evidence.

of a *post*-deprivation hearing, the Court cannot say that the commissioners erred simply by considering the warrant—the Court is reluctant to impose rules of evidence on universities. *See Medlock v. Trs. of Ind. Univ.*, 738 F.3d 867, 871 (7th Cir. 2013) (cautioning courts to avoid "judicializing university disciplinary proceedings"). Nor did *Purdue* disturb precedent that a university need only "some evidence" of misconduct before disciplining a student. *McDonald v. Bd. of Trs. of Univ. of Ill.*, 375 F. Supp. 95, 103 (N.D. Ill.) (using "some evidence" standard and rejecting substantial-evidence standard in analyzing hearing that resulted in student's expulsion for cheating), *aff'd and adopted*, 503 F.2d 105 (7th Cir. 1974). The Court is therefore not persuaded that IU needed to use a higher evidentiary standard or that IU could not consider the arrest warrant as inculpatory evidence.

John's allegations under points (3), (4), and (5) are more concerning. Essentially, he argues that IU mishandled the credibility determinations in John's disciplinary hearing. For one, IU did not call Jane to testify or ask her to provide a written statement, (Compl. ¶¶ 14, 93–97, 106, ECF No. 43), so IU had no way to evaluate her credibility. Yet, IU concluded she was credible. (*Id.* ¶¶ 102, 132, 136, 168.) Additionally, Spotts prevented John's sister from testifying as to impeachment evidence regarding Jane's motivations for falsely accusing John. (*Id.* ¶¶ 104–106, 142.)

In important respects, the alleged procedural defects in IU's hearing parallel those in *Purdue*. Like in *Purdue*, the commissioners here found John's accuser more credible without ever hearing from her. (*Id.* ¶ 136.) Like in *Purdue*, the commissioners

did not try to examine the accuser's credibility, although John identified specific impeachment evidence. (*Id*. ¶ 72.) Like in *Purdue*, the University blocked John from presenting impeachment evidence as to the accuser's motive to lie. (*Id*. ¶¶ 103–106.) And, like in *Purdue*, this case involves a "he said/she said" problem where credibility determinations matter immensely. If true, these facts are sufficient to establish a procedural defect in John's hearing.

This case and *Purdue* do differ in one key respect: Here, the evidence included an arrest warrant against John. IU implies that the fact of an arrest warrant issuing against John—after the complainant convinced a prosecutor and judge of John's wrongdoing—bolsters the complainant's credibility. (Defs.' Br. Supp. Mot. Dismiss at 5, ECF No. 47.) But the arrest warrant here does not cure the procedural defect of making unsubstantiated credibility determinations. Although an accuser must convince both a prosecutor and judge before an arrest warrant issues, the process leading to a criminal charge presents countless unknowns. Did the prosecutor or judge question credibility at all, or did they take Jane's word at face value? By what methods, if any, did they evaluate Jane's credibility? And would they have believed her had they heard John's and his sister's conflicting story? Given these unanswerable questions, IU could not simply substitute the prosecutor's and judge's suspicions for their own credibility determinations and call it a day. While an arrest warrant is "compelling evidence" in the context of summary suspension, *see Hess*, 839 F.3d at 674, and perhaps even probative evidence of guilt in a post-deprivation hearing, *see* Part III.B., *supra*, an arrest warrant alone is not an instrument by which the commissioners

could have independently evaluated Jane's credibility.  The additional fact of an arrest warrant here therefore does not meaningfully distinguish this case from *Purdue*.

Finally, as to the Spotts objection, IU says that John has failed to state a claim because he has not demonstrated how the evidentiary objection prejudiced him—for example, John did not plead that his sister's blocked testimony regarding Jane's motive to lie would have changed the commissioners' minds.  (Defs.' Br. Supp. Mot. Dismiss at 27, ECF No. 47.)  The Court disagrees.  Depriving a student of a procedurally adequate hearing by making unsubstantiated credibility conclusions about the complainant is "fundamentally unfair." *Purdue*, 928 F.3d at 664.  Moreover, the *Purdue* panel implied that harmless error analysis is not appropriate for this type of procedural defect. *Cf. id.* ("Sermersheim and the Advisory Committee may have concluded in the end that John's impeachment evidence did not undercut Jane's credibility.  But their failure to even question Jane or John's roommate to probe whether this evidence was reason to disbelieve Jane was fundamentally unfair to John.").  In the criminal trial context, inferring prejudice is appropriate for those structural errors that result in a "fundamentally unfair" proceeding. *See generally Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907–08 (2017).  By analogy, John does not need to make a specific showing of prejudice resulting from IU's unsubstantiated credibility conclusions, which made his hearing "fundamentally unfair."

In sum, John has sufficiently alleged that his hearing was procedurally defective because it was a "sham."[5]

### C. John has not waived his due process rights.

According to IU, even if John has established a deprivation of his liberty interest, his suit should be dismissed because he waived any relevant due process rights as a matter of strategic choice—that is, IU says that John and his counsel strategically *chose* to proceed at the hearing without Jane so that they could present a one-sided case. (Defs.' Br. Supp. Mot. Dismiss at 23, ECF No. 47.)   Certainly, an individual may waive his procedural due process rights if such waiver is knowing and voluntary.   *See Domka v. Portage Cty., Wis.*, 523 F.3d 776, 781 (7th Cir. 2008).   And, at least in some contexts, "a strategic choice provides strong evidence of waiver."   *United States v. Hunt*, 930 F.3d 921, 924 (7th Cir. 2019) (conditions of supervised release); *United States v. Butler*, 777 F.3d 382, 387 (7th Cir. 2015) (U.S. Sentencing Guidelines calculation); *United States v. Cooper*, 243 F.3d 411, 417 (7th Cir. 2001) (evidentiary objection).   Assuming the doctrine of waiver by strategic choice applies to John's disciplinary hearing, the Court still cannot infer that the complainant's absence was a matter of John's strategic choice.   Nowhere does John plead that he wanted to avoid confronting Jane for his own advantage.   The complaint, viewed in the light most favorable to John, simply does not give rise to any such inference.   Thus, John has not waived his due process rights.

---

[5] Deciding whether John had the right to cross-examine Jane is unnecessary at this point because the Court has found that John has sufficiently alleged that the hearing was defective on other grounds.

### D. John has standing to request the injunctive relief sought.

IU concedes that John has standing to request expungement of his disciplinary record. (Defs.' Br. Supp. Mot. Dismiss at 26, ECF No. 47.) But IU contests John's standing to seek other parts of the equitable relief demanded: reinstating John as a student and providing him a new disciplinary process consistent with due process; immediately allowing John to enroll in courses for the current term; and rescinding negative academic consequences stemming from the discipline. (Compl. at 40–42, ECF No. 43.)

To have standing at this stage, John must allege "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014)). Contrary to IU's assertions, John has alleged that he intends to return to campus to complete his undergraduate degree. (Compl. ¶ 112, ECF No. 43.) John's case is therefore distinguishable from *Purdue*, where requests for comparable injunctive relief were dismissed for lack of standing because the plaintiff had failed to allege that he intended to return to Purdue. 928 F.3d at 666. Furthermore, John has amply alleged how the disciplinary hearing has directly and concretely harmed him. (*See, e.g., id.* at ¶¶ 11, 110, 148, 154–155, 164–165, 180.) The relief sought would clearly redress his injuries. John therefore easily has standing to seek the above relief.

### E. The individual Defendants are proper at this stage.

Even if John had properly pleaded facts demonstrating a procedurally defective disciplinary hearing, IU contends that he lacks standing to sue the individual Defendants.  Specifically, IU's main argument here is that John's amended complaint merely alleges a substantive disagreement with each Defendant's ultimate finding of guilt, something the courts are not in the business of reviewing.  *See Medlock v. Trs. of Ind. Univ.*, No. 1:11-CV-00977-TWP, 2013 WL 1309760, at *6 (S.D. Ind. Mar. 28, 2013), *aff'd*, 738 F.3d 867 ("It is the Court's job to determine whether Mr. Medlock received adequate due process under the circumstances, not to review the decision of the university or second-guess the university officials' determination as to what constitutes a 'threat of disrupting the academic process.'").

But John *has* sufficiently alleged at least one procedural defect here.  *See* Part III.B., *supra*.  Moreover, John has alleged that each named Defendant played a part in that purported deprivation of his liberty interest.  Spotts prevented John's sister from opining on Jane's motivation for making a false accusation.  (Compl. ¶¶ 104–106, 142, ECF No. 43.)  The commissioners made credibility determinations about Jane without actually evaluating her credibility, by testimony or otherwise.  (*Id.* at ¶¶ 14, 79, 104, 168.)  Given that John has adequately pleaded that his hearing was defective by reason of unsubstantiated credibility determinations, Spotts and the commissioners were sufficiently involved in IU's conduct such that John has standing against them.

Finally, John alleges that Provost Robel placed improper weight on the criminal charge, (*id.* ¶¶ 83–90), and denied John's appeal, (*id.* ¶ 83).  The first charge is not

misconduct.  *See* Part III.B, *supra*.  The second charge does not state a claim against Robel either, as the Due Process Clause does not guarantee a right to appeal even in the trial context.  *See, e.g., Griffin v. Illinois*, 351 U.S. 12, 18 (1956).  John has, however, alleged that one of Provost Robel's duties is ensuring that IU complies with due process mandates.  (Compl. ¶ 36, ECF No. 43.)  That fact is enough, for now, to keep Robel as a defendant.

### F. The University officers can be subject to a § 1983 suit for injunctive relief.

IU argues that John's § 1983 claims against the Trustees, Robel, Spotts, and the commissioners in their official capacities are barred.  State university officers acting in their official capacities are not "persons" who can be sued for damages under § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir. 1987).  But official-capacity suits against state officers for injunctive relief are permitted under § 1983 and are not barred by the Eleventh Amendment.  *See Will*, 491 U.S. at 71 n.10 (citing *Ex parte Young*, 209 U.S. 123, 159–160 (1908)); *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000); *Kashani*, 813 F.2d at 848.  Accordingly, to the extent John seeks monetary damages from Defendants in their official capacities, his claims are dismissed with prejudice.  To the extent John similarly seeks injunctive relief, his claims may proceed.

### G. The Court reserves ruling on whether Defendants are entitled to qualified immunity.

Defendants assert qualified immunity to the extent John seeks damages from Defendants in their personal capacities.  State "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right,

and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted).  Although there is "no hard-and-fast rule" against it, *Purdue*, 928 F.3d at 665, "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds," *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001).  That is because qualified immunity often "depend[s] on the particular facts of a given case," *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000), which are often not sufficiently developed at the pleading stage.

The Court will reserve ruling on whether Defendants have qualified immunity until a later stage in litigation.  After *Purdue*, it is at least clearly established that a student can state a claim based on a state university's deprivation of his liberty interest.  928 F.3d at 665–66.  But John's case is different enough from *Purdue* that specific facts will affect the Court's decision on qualified immunity.  For instance, one of John's allegations is that IU's failure to provide him an opportunity to confront his accuser rendered the disciplinary hearing fundamentally unfair.  (Compl. ¶ 132, ECF No. 43.)  The Seventh Circuit, however, has never ruled on whether a student has a right to cross-examination in these circumstances.  *See Purdue*, 928 F.3d at 664 n.4 (declining to reach the issue of whether the plaintiff was entitled to cross-examine his accuser because the hearing was procedurally defective on other grounds).  If John can cure the pleading defects identified in this order, and if after discovery John's constitutional claims hinge on an alleged right to cross-examine and the Court recognizes that right, Defendants would be entitled to qualified immunity; on the other

hand, if John's claims ultimately hinge on procedural deficiencies like those found in *Purdue*, Defendants would not be so entitled.  Thus, waiting to rule on qualified immunity is prudent.

## IV.    Conclusion

Defendants' motion to dismiss, (ECF No. 46), is **granted**.  John's claims are **dismissed without prejudice**.  John is granted leave to amend within **twenty-one days** of this order's issuance.

**SO ORDERED.**

Date: 10/26/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Tracy Nicole Betz
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
tbetz@taftlaw.com

Vivek Randle Hadley
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
vhadley@taftlaw.com

Eric J. Rosenberg
ROSENBERG & BALL CO. LPA
erosenberg@rosenbergball.com

Michael C. Terrell
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mterrell@taftlaw.com