**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

JOHN DOE,

     Plaintiff,

v.

THE TRUSTEES OF INDIANA
UNIVERSITY, PROVOST LAUREN ROBEL,
LIBBY SPOTTS, ROBERT BILLINGHAM,
MICHAEL COURTNEY AND GRAHAM
VOGTMAN,

         Defendants.

CASE NO. 1:20-CV-123-JRS-DML


**MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT**


Plaintiff John Doe ("John"), by and through his attorney, replies to defendants' Brief Supporting Their Motion to Dismiss Amended Complaint (ECF No. 61).[1] For the reasons argued herein, the Court should deny Defendants' Motion to Dismiss Second Amended Complaint (ECF No. 60).

## INTRODUCTION

As discussed in this Court's Order (ECF No. 58), the sole question before this Court is whether Indiana University's ("IU" or "the University") disclosure of John's discipline on his transcript is state disclosure of stigmatizing information. The answer to this question is yes. For, IU

---

[1]Defendants' Brief Supporting Their Motion to Dismiss is hereinafter cited as "*Motion*."

stamped John's transcript with the following damning and stigmatizing information: "STUDENT IS ON DISCIPLINARY SUSPENSION EFFECTIVE 12/16/2019. Critical Probation." *Second Amended Complaint* at ¶¶ 166, 168(d).[2] John's transcript was then transmitted directly to Purdue University by IU's Office of Admission. *Id.* at ¶ 165. As detailed below, this allegation meets the state publication component of the stigma-plus test because (a) John was compelled by Purdue to authorize the disclosure of his IU transcript, and (b) IU placed the stigmatizing disciplinary finding on the transcript that it sent to Purdue.

If IU wanted to avoid publishing the damning and stigmatizing information, it had two options: IU could have sent a clean transcript that did not reveal John's disciplinary suspension, or it could have told John that IU could not respond to Purdue's request for the transcript without disseminating the disciplinary matter. IU did neither. As a result, IU stigmatized John by unilaterally publishing on his transcript its erroneous suspension and sending the same to Purdue.

Because the issues addressed herein have previously been briefed thoroughly and at length, and to ensure a complete record for appellate review, John incorporates by reference all prior briefs and arguments submitted in response to defendants' earlier-filed Motion to Dismiss Amended Complaint (ECF No. 46).

## ARGUMENT

### I.   JOHN HAS ADEQUATELY ALLEGED A PROTECTED LIBERTY INTEREST

When this Court dismissed John's First Amended Complaint without prejudice, it did so because John had not alleged state disclosure of the disciplinary action. *Entry and Order of Defendants' Motion to Dismiss* ("Order") at 6-9 (ECF 58). The central question presented here is a narrow one: Did

---

[2] The Second Amended Complaint (ECF No. 59), filed on November 11, 2020, is cited hereinafter as "*2d Amend. Compl.*"

PAGE 2—PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT

IU disclose damaging information to Purdue? The answer, simply put, is yes. IU published stigmatizing information when it sent John's transcript to Purdue stamped with the following information:

STUDENT IS ON DISCIPLINARY SUSPENSION EFFECTIVE 12/16/2019
Critical Probation

*2d Amend. Compl.* at ¶ 166. John did not ask IU to place this damaging information on his transcript. *Id.* Indeed, John has no say or control over what information is contained on his transcript. *Id.* In the face of John's incontrovertible allegation that IU disseminated the stigmatizing information defendants assert "the University [IU] here made its disciplinary finding, and then kept it to itself." *Motion* at 8. The aforementioned facts disprove defendants' assertion.

When John submitted his application for admission to Purdue in Spring 2020, he did so in the hope that he could continue his college education while he was under suspension from IU. *2d Amend. Compl.* at ¶ 163. John had already lost two semesters of studies and would not be permitted to reenroll at IU until Spring 2021 at the earliest. *Id.*, Ex. 2 at 2 (ECF No. 59-2). John's suspension sanction was firm. By the terms of John's disciplinary ruling, John's suspension, which started on November 11, 2019, would be "in effect for a **minimum of one calendar year**." *Id.*, Ex. 2 at 2 (emphasis in original). John had no option for an earlier readmission, even though as of February 2020 the prosecutor agreed to dismiss the charges against him—charges which served as the basis for his suspension—and even though John made no admission of guilt and his arrest would be expunged. *2d Amend. Compl.* at ¶¶ 97, 162 and Ex. 6.

John, however, was committed to mitigating the damages stemming from an extended gap in his academic studies. *Id.* at ¶ 163. He wanted very much to get his life back on track as quickly as possible by resuming his education elsewhere, if necessary. The Purdue application <u>required</u> that John disclose whether he had ever been subject to a disciplinary action. *Id.* at ¶165. John had to answer

truthfully, and so he did. *Id.* at ¶¶ 113, 165.[3] Purdue also imposed on John a requirement that he authorize IU to send his transcripts, which he did. *Id.* at ¶¶ 165, 168. John has no control over the information contained on his transcript, only IU does. When IU sent John's transcript to Purdue with the damning information, IU—not John—disseminated his erroneous disciplinary record.[4] *See Order* at 8. On this fact alone, John establishes state disclosure of the stigmatizing information.

We know this in part because this Court determined John's initial complaint adequately plead that the stigma of IU's disciplinary action would make it virtually impossible to enroll in a reputable graduate school. *Order* at 10. John's Second Amended Complaint contains similar evidence. *2d Amend. Compl.* at ¶ 167. In fact, John can hardly hope to obtain a coveted MBA degree, when he cannot even gain admission to a reputable four-year university. *Id.* at ¶¶ 153, 156, 159. John now adds to his allegations that owing to the stigma of his disciplinary record, transfer to an equivalent four-year university is not "virtually" impossible, it is impossible. *Id.* at 167. And, of course, without an undergraduate degree John has no hope for admission to graduate school. *Id.* at ¶¶ 153, 174; *see generally* Ex. 2 (ECF No. 59-2).

A. <u>IU Disseminated John's Disciplinary Record When It Placed the Stigmatizing Information on His Transcript and Sent it to Purdue University.</u>

The publication requirement of the stigma-plus test is met when disclosure of the damaging information is (1) "compelled," (3) "certain," and (3) "not self-published." *Order* at 7 (citing to *Doe v. Purdue Univ.*, 928 F.3d at 662). John has alleged just that.[5]

---

[3]John submitted his Purdue application under penalty of perjury. *2d Amend. Compl.* at ¶ 165. He answered honestly and could do nothing less. Were John anything less than honorable, a failure to disclose the disciplinary action, if discovered, would likely result in a sanction or possible expulsion from the academic institution. *Id.* at ¶ 174. In the end, however, John's conduct is beside the point because IU independently and unilaterally disclosed the disciplinary action by publishing it on his transcript.

[4]Presumably, universities require that an academic transcript be sent directly from the originating school to the recipient school so that it cannot be altered by the student in the process. The recipient university is thus assured the transcript is authentic and accurate.

[5]The requirements that the disclosure be compelled and not self-published are essentially two sides of the same coin. When one discloses because he is *compelled* to make the disclosure, the disclosure is by definition, self-published. Nonetheless, the disclosure is deemed *involuntary* because it was compulsory.

PAGE 4—PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT

Defendants argue that John does not state a claim for relief because he voluntarily applied to Purdue, answered the application questions truthfully under penalty of perjury, authorized IU to release of information, and thereby self-published this damning information. *Motion* at 6, 9 (ECF No. 61). Defendants also claim, incorrectly, that John has not met the stigma-plus test because IU did not compel the disclosure. Specifically, they argue that John cannot show a "'compelled state-disclosure because none of the 'requirements' or 'legal obligations' . . . *came from IU*." *Motion* at 7 (italics in original). Defendants add that because the legal obligation to disclose "*came afterwards from Purdue*," there is no compulsion. *Id.* (italics in original).

Defendants have it wrong. Under the relevant law and under the facts presented, the legal obligation to disclose had nothing to do with the state actor or agency who possessed or controlled the damaging information. Rather, as discussed below, the disclosure was compelled by another (external) agency or by state law. Defendants' arguments are contrary to the Seventh Circuit's decisions in both *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005) and *Doe v. Purdue Univ.*, 628 F.3d 652 (7th Cir. 2019). Defendants ignore the actual facts in both cases when making the erroneous argument that because "IU did not compel any disclosures," there is no state disclosure. *Motion* at 5. In fact, neither *Dupuy* nor *Purdue* stands for the proposition that the state actor holding the damning information must compel its disclosure.

In *Dupuy*, the Seventh Circuit addressed an Illinois law that mandated the Department of Children and Family Services ("DCFS") maintain a central register of persons named in child abuse reports. *Dupuy*, 397 F.3d at 496. This law also required this information remain confidential. *Id.* at 514. As a result, DCFS contended that there was no liberty interest violation because "at the time DCFS decides to create a report, it does not disclose that report to any potential future employer." *Id.* at 510. The *Dupuy* panel disagreed, concluding that <u>all prospective employees of a childcare facility must authorize DCFS</u> to conduct a background check to determine if there is an abuse report against him.

*Id.* The disclosure, plaintiffs argued, occurred by operation of statute, whenever an applicant looks for work in the childcare field since: "DCFS discloses indicated [child abuse] reports to employers whenever an applicant looks for work in the child care field." *Id.* The *Dupuy* panel thus held "the publication requirement of the stigma-plus test was satisfied because plaintiffs [e.g., prospective childcare workers] were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers." *Id.* John's case aligns directly with *Dupuy* because just as the prospective childcare employer requires a background check from the prospective career entrant before making a hiring decision, here, the prospective university, Purdue, required John disclose his transcript before making an admission decision. *See id.* Thus, the disclosure was neither voluntary nor self-published.

John's claim also falls squarely within the facts set forth in the *Purdue* decision. Indeed, the *Purdue* panel rejected the very argument IU makes here. In *Purdue*, the university argued the Navy knew about the disciplinary action "only because John signed a form authorizing the disclosure after the investigation began." *Purdue*, 928 F.3d at 661. The university added that because "John permitted the disclosure, he cannot complain that Purdue stigmatized him." *Id.* The Seventh Circuit disagreed, reasoning that it was the Navy—not Purdue—that required the plaintiff to authorize Purdue to disclose to the Navy information about plaintiff's Title IX disciplinary proceeding. *Id.* And even though Purdue (like IU here) argued it would not "divulge John's disciplinary record without his permission," the *Purdue* panel determined the plaintiff established a liberty interest because the Navy imposed on plaintiff "an obligation to authorize Purdue to disclose the proceedings to it." *Id.* Therefore, contrary to defendants' assertion, to satisfy the stigma-plus test John need not show that IU compelled disclosure, he need only show the disclosure was in fact compelled, and that the information was in fact disseminated. Under these circumstances the disclosure is not self-published. The Purdue panel summed it up this way:

> disclosure was not self-published . . . even if the plaintiff had been
> obligated to authorize it. [Because] Purdue, not [plaintiff], revealed to
> the Navy that it had found him guilty of sexual violence, and [plaintiff]
> had a legal obligation to authorize the disclosure.

*Purdue*, 628 F.3d at 662.

John found himself in the same position as the *Purdue* plaintiff: Just as the Navy imposed a requirement that plaintiff Doe authorize disclosure of the investigation, so too did Purdue impose on John an obligation to authorize IU to disclose his transcript, and IU revealed the discipline on John's transcript. *2d Amend. Compl.* at ¶ 165-166.

Notably, John could not be considered for admission without authorizing disclosure of his transcript. *Id.* at 165. As alleged in his Complaint, to submit a transfer application to Purdue, John had to execute the "Submission and Signature Statement," which expressly required that John "authorize . . . post-secondary schools [he] attended to release information needed by Purdue to process and verify [his] application." *2d Amend. Compl.*, Ex. 8 at 1; ¶ 169. This demand included a request to send official transcripts directly to Purdue's office of admissions. *2d Amend. Compl.*, Ex. 8 at 1. John did as was required and authorized release of his transcript, which contained the erroneous and stigmatizing information IU had placed on it. *Id.* at ¶ 169. Therefore, just as in *Purdue*, "[IU], not John, revealed to [Purdue] that it had found him guilty of [violating IU's policies], and John had a legal obligation to authorize the disclosure." *Purdue*, 928 F.3d at 662.[6]

Defendants also argue that because John's choice to apply to transfer was voluntary, an application requiring him to be honest and one requiring that he authorize transmission of his

---

[6]Even though John's transcript did not mention the nature of the charge (sexual misconduct), the effect of the disclosure of a sudden "Disciplinary Suspension" and "Critical Probation" was the same. It revealed a disciplinary proceeding that resulted in a stigmatizing, adverse outcome. Assuming Purdue received no other information from IU, this information standing alone was sufficiently damaging and defamatory, causing Purdue *to reject summarily* John's application for admission. *2d Amend. Compl.* at ¶ 167. After receipt of John's transcript, Purdue never requested more information of John (it did not seek an explanation) nor did it afford him an opportunity to appeal. *Id.*

transcript does not establish a "compelled" state-disclosure under *Dupuy* or *Purdue*. *Motion* at 8. for instance, defendants assert that because IU has no control over Purdue's application standards or the questions asked, there should be no liability against IU. *Id.* This argument misses the central point, a point this Court has already affirmed in its Order, which is that John's career opportunities are foreclosed if he cannot pursue higher education. *Order* at 10, 11. The Court found that at this stage of his case, John's allegations that IU's discipline makes it "virtually impossible to enroll in a reputable graduate school" plausibly show that his "intended career in higher-level business management is essentially foreclosed." *Id.* The same is true if John cannot enroll in a reputable four-year university since an undergraduate degree is necessary for admission to graduate school.

Defendants will likely claim that John's undergraduate education is not foreclosed because he is only suspended from IU, not expelled. Yet John's readmission to IU is not guaranteed, he must "petition for reinstatement." *2d Amend. Compl.*, Ex. 2 at 2. He is required to submit a written statement to the Office of Student Conduct outlining the "actions you [John] have taken to repair any harm that was done, and measures that you have put in place to ensure this will not occur again." *Id.* The University will then "make a decision as to whether [John] should be allowed to return." *Id.* On its face, this requirement poses an insurmountable hurdle for John's readmission. This is because John cannot address actions taken "to repair any harm" when he has not committed any harm. Nor can he confess to ensuring the harm will not recur when it did not occur in the first place. Thus, IU's readmission requirement creates an impossible task. John has always asserted his innocence and cannot and will not confess to wrongdoing simply to regain admission. *See*, *e.g.*, *id.* at ¶¶ 1, 44-45, 47, 76. It remains to be seen whether the University will reinstate John based on a written statement in which he does not accept the guilty finding from his flawed disciplinary hearing. Should the University deny John readmission, the inexorable result is that John's educational and professional objectives are terminated. *See*, *e.g., 2d Amend. Compl.* at Ex. 5 (Declaration of Cynthia Purcell Garrett). Again, owing

to the stigma of IU's disciplinary action, Purdue's denial of John's transfer application proves he can no more enroll in a reputable four-year university than a reputable graduate program. *See 2d Amend. Compl.* at ¶¶ 108, 155, 167; *Order* at 11.

Lastly, defendants cite to various defamation cases in an effort to analogize John's case to those in which the plaintiff's claim has failed owing to self-publication. Simply put, those cases are not relevant. While the stigma-plus test incorporates principles of defamation law, they do not address the central issue here, whether there is a protected liberty interest. Both *Purdue* and *Dupuy* are on point, and the Court should look to those cases, not other defamation case law when evaluating the merits of John's liberty interest claim.

B. IU Placed Erroneous Information on John's Transcript When It Noted His Disciplinary Suspension.

Recognizing that IU disseminated John's disciplinary record on his transcript, defendants then claim without support that the information about his suspension was not defamatory. *Motion* at 13. But just saying it does not make it so. Defendants do not explain how or why telling another institution that the student has been disciplined and suspended is not defamatory. They offer no support in law or fact to defend this bald assertion. John for his part has alleged—and shown—that the information about his disciplinary suspension is, as a matter of fact, defamatory. *See, e.g., 2d Amend. Compl.* at ¶¶ 1, 44, 45, 47, 76. John alleges that "he has [ ] been denied admission [to Purdue] owing to his disciplinary record." *Id.* at ¶ 167. The letter John received from Purdue establishes at much. John was denied admission based on a recommendation of Purdue's Personal Conduct Committee, a committee expressly charged with determining whether any applicant poses a threat to the safety of the campus community. *Id.* IU's flawed finding of misconduct stigmatized John because based on IU's erroneous suspension of John, Purdue deemed John unsuitable for admission. The information IU shared was

by definition stigmatizing because if nothing else it discredited John by erroneously suggesting that he demonstrated disgraceful or dishonorable conduct.[7]

In summary, John presents facts that establish a plausible violation of his liberty interest which is all that is required to defeat defendants' motion pursuant to the Supreme Court's *Twombly* and *Iqbal* decisions. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (finding a FRCP 12(b)(6) motions must be denied if plaintiff "state(s) a claim to relief that is plausible on its face."); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Dismissal of defendants' motion is also warranted because John alleged—on information and belief—that IU provided his entire disciplinary file to Purdue. *2d Amend. Compl.* at ¶ 168. John did so based on reasonable inferences drawn from Purdue's denial letter. *Id.* In response, defendants argue that John's allegations are speculative and hypothetical and therefore should not be credited. *Motion* at 11-12.[8] This argument should be rejected since John had every reason to postulate based on what he was told in the letter from Purdue denying him admission that IU had shared his disciplinary file. *2d Amend. Compl.* at ¶ 168. This is because the denial letter states Purdue's PCC "review[ed] John's file" and recommended denial of admission. *Id.* Because John had not provided any details about the disciplinary matter, he plausibly inferred that the PCC received specific information from IU, which led the PCC to the conclude that "[John] pose[d] a threat to the safety of the campus community." *Id.* at ¶ 167.

---

[7] To stigmatize is "1. To characterize or brand as disgraceful or ignominious." American Heritage College Dictionary (3d ed. 1997).

[8] In defendants' Motion at 1, n. 1, they allege without proper attestation that "IU never disclosed any information relating to Plaintiff to Purdue, including any disciplinary action or record." *See also Exhibit 1* (Nov. 27, 2020 letter from IU Counsel to undersigned counsel addressing same); *Exhibit 2* (undersigned counsel's Dec. 2, 2020 response to IU Counsel's Nov. 27, 2020 letter); *Exhibit 3* (undersigned counsel's Dec. 21, 2020 response to undersigned counsel's Dec. 2 letter); and *Exhibit 4* (undersigned counsel's Dec. 21, 2020 response to IU Counsel's Dec. 21, 2020 letter).

After John filed his Second Amended Complaint, defendants' counsel alleged IU never gave Purdue a copy of John's disciplinary file. *See* Exhibit 1. Then late this afternoon, defendants provided John a declaration addressing this issue. *See* Exhibit 3. John was therefore hogtied in addressing this eleventh-hour declaration. *See* Exhibit 4. Even so, the declaration does not warrant the dismissal of John's claims. This is because John still prevails under the stigma-plus test. For, as detailed above, it is enough that IU placed the stigmatizing information on John's transcript, which it then sent to Purdue. Hence, John has adequately alleged state disclosure of the disciplinary record and loss of reputation stemming therefrom. These new allegations coupled with the Court's previous findings are sufficient to allege a protected liberty interest. Accordingly, the Court should deny defendants' Motion to Dismiss.

## II. DEFENDANTS' ALTERNATE GROUNDS FOR RELIEF LACK MERIT

Defendants motion contains new evidence and additional argument related to claims this Court has already rejected. Specifically, defendants seek to introduce for the first time an audio recording of John's disciplinary hearing—evidence IU has always had but never made available to John. Defendants recognize that using this audio recording to support their "alternate basis for dismissal" is questionable. *Motion*, Sec. III, at 2. Defendants write that "in the event the Court determines it cannot review the actual disciplinary hearing for purposes of this motion, Defendants expressly request this Court exclude those materials rather than convert this into a summary judgment motion." *Id.* at 4. For the reasons detailed below, this Court should either refuse to consider the audio recorded hearing or it should convert defendants' motion to a motion for summary judgment.

### A. The Law of the Case Doctrine Precludes Reconsideration of the Court's Prior Ruling.

The law of the case doctrine, which defendants ignore entirely, precludes courts from reviewing prior decisions unless there is a compelling reason to do so. The doctrine applies to rulings on a motion to dismiss as well as other substantive decisions. *Sharp Electronics Corp. v. Metropolitan Life*

*Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009); *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007);

*Adams v. Waupaca Foundry*, Case No. 3:17-CV-00140-WFG, 2017 WL 6493090, at *2 (S.D. Ind. Dec.

19, 2017). The law of the case doctrine "reflects the idea that single court should not revisit its earlier

rulings unless there is a compelling reason to do so. It is designed to further consistency, to avoid

constantly revisiting rulings, and to conserve judicial resources." *Sharp Electronics Corp.*, 578 F.3d at

510. A "manifest error or change in the law that warrants re-examination" is deemed compelling.

*Minch*, 486 F.3d at 301 (7th Cir. 2007). In other words, as this Court explained it, "[w]hile the law of

the case is not a 'hard and fast' rule, a party must argue that "an intervening change in the law or other

changed or special circumstance warrants a departure." *Adams*, 2017 WL 6493090, at *2.[9]

Here, defendants offer no compelling reason—no intervening change or special

circumstance—that warrants a departure from the rule. There is simply no reason for the Court to

revisit its previous well-reasoned and thorough decision. Defendants simply posit additional argument

and evidence in the hopes the Court will take a second look. Defendants cannot offer any compelling

reason to depart from the rule because nothing has changed. There are no new or changed due process

allegations, there is no intervening change in the law and there is no manifest error.

Moreover, to allow defendants to revisit the settled due process issue based on the audio

recording (which has always been available to defendants, though never to John) is prejudicial at this

stage in the case. At this early stage, the court, however, must accept "all well-pleaded facts as true

and draw all *reasonable inferences* in favor of the plaintiff." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854

(7th Cir. 2019). Yet defendants seek to undermine this governing principle by inserting selective

evidence to present information from which *competing inferences* might be drawn. This is not the standard

---

[9] If after a district court denies a motion to dismiss, the plaintiff repleads various claims, drops some claims, and adds a number of other state law claims, these intervening changes might justify a new look or revisiting of the prior decision. *Sharp Electronics*, 578 F.3d 505, 510 (7th Cir. 2009). None of these circumstances are present here.

of review on a motion to dismiss. Here, defendants' motion fails because John has now established a plausible violation of his liberty interest. *See* page 10, above, (citing to *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Instead of honoring these mandates, defendants ask this court to construe evidence against John without allowing him to rebut the evidence in discovery. For instance, defendants ignore the fact that depositions of John's commissioners regarding their private conversations and deliberations (which are not recorded) would likely disprove the arguments defendants' raise here. Consequently, John respectfully requests this Court reject defendants' arguments arising out of the recording of John's hearing.

      B.   <u>Defendants Erroneously Argue that the Audio from John's Hearing Mandates the Dismissal of His Second Amended Complaint.</u>

Even assuming this Court considers defendants' arguments based on a recording of John's hearing, it does not provide grounds to dismiss his Complaint. This is because the gravamen of John's due process claim is that IU deprived John of a fair hearing for reasons unrelated to the commissioners' finding that the testimony of John and his sister should not be credited.

This Court already accepted that at least three of John's objections to his IU hearing violated central tenets of due process. The Court agreed that John adequately alleged that IU conducted a sham hearing when it (i) ignored exculpatory evidence, (ii) denied John the opportunity to present impeachment evidence, and (iii) credited (i.e., believed) an absent accuser over John. *Order* at 13. The Court found these allegations to be "concerning" to say the least. *Id.* at 14 (discussing *Purdue.*, 628 F.3d at 652). The audio of the hearing does not alter these procedural defects.

Defendants nevertheless proceed to argue that the hearing audio substantiates the commissioners' credibility determinations and therefore substantiated their decision to find John responsible for sexual misconduct. *Motion* at 18. Defendants' argument, however, wrongly suggests that their assessment of John's credibility and that of his sister is the ultimate issue and thus ends the

inquiry. Remarkably, defendants simply choose to ignore this Court's ruling, which is firmly grounded in the *Purdue* panel's holding that conducting a hearing <u>without hearing from the complainant</u> amounts to inadequate process. As the Court well knows, "[l]ike in *Purdue*, the commissioners here found John's accuser more credible without ever hearing from her." *Order* at 14; *See* 2d Amend. Compl. at ¶ 137. The Court also concluded that "like in *Purdue*, this case involves a "he said/she said" problem where credibility determinations matter immensely." *Order* at 15. Defendants cite to three cases to support their argument the University was within its rights to focus only on John's credibility. Notably, none of these cases were "he said/she said" cases involving allegations of sexual misconduct, and they all predate *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019).[10] Therefore, as *Purdue* directs, unless and until the commissioners hear from the complainant, they cannot make the required credibility assessment. Nothing on the audio recording, which defendants suggest is a game changer, alters this fact. As much as defendants want to use the audio recording to show the commissioners were correct to discredit John, it has no bearing on their failure to examine the complainant's credibility. Hence, defendants' implication that the audio evidence changes all is unfounded—it changes nothing.

Defendants make much of the fact the commissioners found John responsible "based on what we believe were inconsistencies in the testimony related to critical incidents, particularly the incident in the bedroom." *Motion* at 17; Audio transcript at 65, lines 7-9 (ECF 61-2). Yet a neutral and careful review of the transcript fails to reveal any meaningful, substantive inconsistencies that would suggest that either John or his sister was dishonest in their telling of the events that day. <u>If there were *meaningful* inconsistences, defendants would have pointed those out.</u>[11] Instead, they identify in three bullet

---

[10]Defendants cite to *Charleston v. Bd. of Trs. of Univ. of Ill. at Chicago*, 741 F.3d 769 (7th Cir. 2013), *Medlock v. Trustees of Ind. Univ.*, No. 1:11-CV-977-TWP, 2013 WL 1209700 (S.D. Ind. Mar. 28, 2013) and *Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1978) to support the claim that IU provided adequate due process. But none of these cases involve competing "he said/she said" allegations. Thus, *Purdue's* mandate governs here.

[11]To say the testimony of John and his sister had inconsistencies says little about their credibility. Some variations in a retelling of events by two witnesses is to be expected as witness memory is selective and imperfect. It would be more suspicious if John and his sister had told stories that matched up perfectly with no

points, statements that defendants view, through their biased lens, as dubious. *See* Motion at 18. Importantly, none of the cited examples relates to the central allegation of sexual misconduct and none impeaches John's firm and unwavering assertion of innocence.[12] Further, it is worth noting that when it came to the question of John's "opportunity" to engage in sexual misconduct, their testimony aligned. For example, both testified that John was never alone with the complainant. *See* ECF 61-2, Audio Transcript at page 7, lines 11-13; page 42, lines 15-17; page 63, lines 21-22. They also both testified that John was lying next to his sister—not the complainant—while they were napping. *Id.* at page 8, lines 9-10; page 43, lines 2-3; page 51, 13-14. Apparently, and without giving a reason, the commissioners ignored or disbelieved this key exculpatory evidence.

In truth, the commissioners simply chose—without good reason—to disbelieve John and his sister and instead relied largely on the fact the "prosecutor decid[ed] there is enough evidence in the case" to file charges. *Motion* at 17; Audio transcript at 65, lines 9-10 (ECF 61-2). In the absence of meaningful discrepancies or direct evidence of guilt, it appears the commissioners' evaluation of John was heavily influenced by the allegations in the arrest warrant. And as this Court has already determined, "an arrest warrant alone" is not enough to evaluate Jane's credibility, *Order* at 15, and thereby ascertain guilt. Due process here required an independent evaluation of Jane's credibility. *Id.* at 16. Whatever discrepancies or inconsistencies are identified in the hearing testimony at best raise questions of fact, which means these arguments belong in a motion for summary judgment. They are

---

differences whatsoever. In fact, when stories line up precisely, it often suggests the witnesses conspired to tell an exculpatory and perhaps false tale. But again, here, we have no way of knowing what inconsistencies were meaningful to the commissioners because the commissioners never told us. Regardless, this line of inquiry has no relevance because the fatal flaw here is that IU failed to make any finding regarding the complainant's credibility. For instance, if the complainant had testified and was not to be believed, i.e., if she was not credible, then any alleged inconsistencies between John and his sister would mean nothing. This simply goes to show defendants' error in focusing and relying on alleged inconsistencies to justify the flawed hearing and erroneous outcome.

[12]John asserted throughout the hearing that the accusations against him were false. *See* ECF 61-2, Audio Transcript at page 4, lines 3-4; page 7, lines 10-11; page 63, lines 21-23. John's sister said the same. *Id.* at pages 41-42 .

not questions suitable for resolution on a motion to dismiss, where courts treat "all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019).

Defendants also argue contrary to John's allegation that defendant Libby Spotts did not prevent the admission of impeachment evidence. *Motion* at 17 n.5. While it is true that she discouraged any speculative testimony on this question, curiously, she did not prevent the witnesses from speculating about a host of other issues.[13] Only when the question arose about the complainant's *possible motive* to make a false allegation, did she object because "[t]he other party's not here to give us a statement." ECF No. 61-2, page 60, lines 14-21. Of course, had the University observed *Purdue*'s dictate, this crucial evidence would have been allowed. Moreover, this evidence, if allowed, may have had some bearing on the commissioners' decision. The commissioner asked John's sister about the complainant's motive because presumably it was pertinent to his evaluation of the allegations or complainant's credibility. Of course, we cannot know this without deposing the commissioner who posed the question. Similarly, we know nothing about whether the commissioners together deliberated (or speculated) about the complainant's possible motive to lie.[14] These unanswerable questions demonstrate that it is improper at this stage to consider the audio recording because it is being evaluated in a vacuum. John does not have the benefit of evidence that would clarify or contextualize statements made during the hearing.

There are questions arising out of the hearing that can—and should be—addressed through discovery. Instead, defendants essentially maintain that nothing more be known because the record is

---

[13] *See, e.g.*, ECF No. 61-2, Audio Transcript at page 15, lines 13-24; page 20, lines 16-17; page 22, lines 4-9.

[14] It may also be that the commissioners discussed the alleged inconsistencies during their deliberation on John's guilt. This John will not know and cannot know—without discovery, which proves the point made earlier: It would be prejudicial to allow this audio evidence at this stage in the litigation because to do so leads to competing, adverse inferences against John based on an incomplete record.

PAGE 16—PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT

clear. Not so. The record defendants endeavor to advance through the introduction of the audio recording at most raises more questions; while at the same time it affirms the plausibility of John's allegations. Accordingly, the evidence should be disregarded or in the alternative should be used to convert defendants' motion to dismiss to a motion for summary judgment.

## CONCLUSION

For the reasons shown in Section I, above, John has alleged a protected liberty interest. Though he voluntarily applied to Purdue, he did so to continue to pursue his undergraduate education, which is an essential step on the path to a graduate MBA degree. Because his application to Purdue required without exception that he authorize IU to send a transcript, the disclosure was compelled. And because IU stamped John's transcript with the information about his suspension, IU—not John—disseminated the stigmatizing information. Accordingly, John has satisfied the elements of the stigma-plus test and has stated a claim that IU violated his liberty interest.

John objects to defendants' alternate argument and the introduction of the audio recording based on the law of the case doctrine. But even if the Court considers the testimony offered, nothing there undermines John's allegations of defective process. Though the commissioners chose to disbelieve John and his sister, it does not alter the fact that IU did not call the complainant to testify or ask her to provide a written statement. *Order* at 14; *2d Amend. Compl.* at ¶¶ 14, 93-97, 106.
Further, contrary to IU's biased reading of the audio transcript, there are no material differences between the testimony of John and his sister. A careful and thorough review of their testimony demonstrates that on all material points, the two were consistent. The testimony presented was exculpatory.

//

//

//

Lastly, should the Court determine that it is appropriate to include the transcript in its review, then this motion should be converted to a motion for summary judgment. In which case, the motion should be denied because, as shown above, the audio transcript presents genuine issues of material fact that preclude judgment in defendants' favor.

Respectfully submitted,

/s/ *Eric J. Rosenberg*

Eric J. Rosenberg (0069958)
205 South Prospect St.
Granville, Ohio 43023
Telephone 740.644.1027
erosenberg@rosenbergball.com
*Attorney for Plaintiff John Doe*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 21, 2020, I filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of the filing to all registered parties.

/s/ *Eric J. Rosenberg*
Eric J. Rosenberg (0069958)