UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:20-cv-00123-JRS-DML |
| ) | |
| TRUSTEES OF INDIANA UNIVERSITY, ) | |
| LAUREN ROBEL, ) | |
| KATHY ADAMS-REISTER, ) | |
| LIBBY SPOTTS, ) | |
| ROBERT BILLINGHAM, ) | |
| MICHAEL COURTNEY, ) | |
| GRANT VOGTMAN, ) | |
| ) | |
| Defendants. ) | |

**Order on Pending Motions**

After being suspended for alleged sexual misconduct, Plaintiff John Doe sued the Trustees of Indiana University, Lauren Robel, Kathy Adams-Reister, Libby Spotts, Robert Billingham, Michael Courtney, and Grant Vogtman (together, "IU") under 42 U.S.C. § 1983, alleging a deprivation of due process. The Court will not repeat the factual background, which is available in *Doe v. Trustees of Indiana University*, No. 1:20-cv-00123-JRS-DML, 2020 WL 6274816 (S.D. Ind. Oct. 26, 2020). There, the Court dismissed the First Amended Complaint for failure to plead the state-disclosure element of a stigma-plus claim. (*See* ECF No. 58.) John has now filed a Second Amended Complaint, (ECF No. 59), which he says remedies the issue. Defendants again move to dismiss for failure to state a claim. (*See* ECF No. 60.)

1

## I. Standard of Review

In deciding a motion under Rule 12(b)(6), the Court must determine whether a complaint's factual allegations "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court's inquiry on a motion to dismiss must be limited to the allegations in the operative complaint, and extrinsic evidence may be considered only if it is "referred to in the plaintiff's complaint" and "central to his claim." *Hutcherson v. Krispy Kreme Doughnut Corp.*, 803 F. Supp. 2d 952, 956 (S.D. Ind. 2011) (citations omitted).

However, if "matters outside the pleadings are presented to and not excluded by the court," a Rule 12(b)(6) motion "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

In his brief in opposition to the second motion to dismiss, John attached an exhibit—the Declaration of Libby Spotts, (ECF No. 66-3 at 4)—that is purely extrinsic.[1] Rather than rule on the motion to dismiss, the Court indicated that it wanted to consider the declaration, and it invited the parties to submit any additional evidence related to the declaration. (*See* ECF No. 71.) Each party has now done so or notified the Court that no additional evidence would be forthcoming. (*See* ECF Nos. 72, 75.) Accordingly, the Court now converts IU's second motion to dismiss under Rule 12(d), treating the motion as one for summary judgment.

---

[1] Apparently, counsel for IU obtained the declaration and sent it to John's counsel the day before John's brief in opposition to the motion to dismiss was due. (ECF No. 66-3 at 1–3.)

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of production. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169). If the movant discharges its initial burden, the burden shifts to the non-moving party, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of his case. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). The Court must construe all facts and any reasonable inferences arising from them in favor of the non-movant. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted).

## II.   Motion to Strike

IU moves to strike several parts of the Doe Declaration, (ECF No. 72-1 at 1–5), which John filed in response to the Court's notice that it would convert the motion to dismiss into one for summary judgment. Alternatively, IU asks the Court not to rely on the parts of the Doe Declaration that IU believes are inadmissible. The content of the Doe Declaration essentially mirrors the allegations in the Second Amended Complaint, in fewer words. The Court will only rely on the portions of the declaration

that are admissible, so the motion's alternative request is **granted**. To the extent the Court has cited any part of the Doe Declaration in this order, the motion to strike, (ECF No. 76), is **denied**.

### III. Discussion

The Due Process Clause guarantees certain procedures when a state actor deprives someone of "life, liberty, or property." U.S. CONST. amend. XIV, § 1. Of course, a deprivation of life is not at issue. And no one disputes that the Seventh Circuit does not recognize a stand-alone property interest in higher education at a state university. *See Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013). So, the issue narrows to whether the Second Amended Complaint adequately establishes a liberty interest. To establish a liberty interest under the "stigma-plus test," John must show (1) that the state disclosed false information that damaged his reputation, (2) that the reputational harm made it "virtually impossible" for him to find employment in his chosen profession, and (3) that his legal status was altered, depriving him of a previously held right. *See Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) (citations omitted).

*A. Legal Rule*

The parties read the operative stigma-plus cases differently and dispute whether common law formulations of defamation are relevant. Some historical background may help illuminate the legal rule. The stigma-plus test was first articulated in *Paul v. Davis*, 424 U.S. 693 (1976). The Supreme Court in *Paul* clarified that the "mere defamation of an individual" without a showing of a change in legal status was

4

insufficient to invoke the guarantees of procedural due process." 424 U.S. at 706. Breaking down the term "stigma-plus," then, "stigma" refers to the government's act of defamation, and "plus" refers to a change in legal status. Notably, the "stigma" part of the stigma-plus test has always been grounded in common-law conceptions of defamation, ever since the test's origin in *Paul*.

Soon after *Paul*, the Supreme Court rejected application of the stigma-plus test "when there is *no public disclosure* of the reasons for the discharge." *Bishop v. Wood*, 426 U.S. 341, 348 (1976) (emphasis added). The "classic case" of government defamation envisioned by the justices was a "government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure." *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997) (referencing the facts in *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951)). In that prototypical situation, the government—*on its own initiative*—intervenes to thwart a blacklisted employee's later attempts to get hired.

Over time, courts applied the stigma-plus test to more nuanced circumstances. In the process, courts have continued to analogize to common-law defamation principles when analyzing stigma-plus claims. In *Olivieri v. Rodriguez*, a police officer in training, Olivieri, was fired without a pre-deprivation hearing for allegedly sexually harassing other trainees. 122 F.3d at 407. The ex-officer sued the police superintendent under § 1983, and the district court granted summary judgment for

5

the superintendent. *Id*. On appeal, Olivieri sought to dispense with the public-disclosure requirement of stigma-plus claims. *Id*. at 408. Olivieri said that, inevitably, he would need to disclose that he had been fired for sexual harassment in future job interviews with police departments, which would "reveal the ground of the termination as effectively as (actually more effectively than) if the Department had taken out a full-page ad in every newspaper in the nation announcing" the reasons for Olivieri's termination. *Id*. at 408. Citing common law, Judge Posner declined to alter the legal rule and wrote that Olivieri had not established a liberty interest under the stigma-plus test because he had not proven state publication:

> [Olivieri's] position resembles the largely discredited doctrine of "compelled republication" or (more vividly) "self-defamation," which allows the victim of a defamation to satisfy the requirement of publication by publishing it himself, for example to prospective employers as in the present case. . . . The doctrine is inconsistent with the fundamental principle of mitigation of damages. It is no doubt highly likely that the ground of Olivieri's discharge would become known to prospective employers, but it is not certain. A prospective employer might not ask him—might ask only the Chicago Police Department, which for all we know might refuse to disclose the grounds of Olivieri's discharge; many former employers refuse to answer such inquiries, because of fear of being sued for defamation. The principle of self-defamation, applied in a case such as this, would encourage Olivieri to apply for a job to every police force in the nation, in order to magnify his damages; and to blurt out to each of them the ground of his discharge in the most lurid terms, to the same end. Most states, as noted in the decisions cited above, reject self-defamation as a basis for a tort claim, and it would be odd for federal constitutional law to embrace this questionable doctrine.

*Olivieri*, 122 F.3d at 408–09. Unlike the prototypical government-blacklist situation, the government never disclosed the grounds of Olivieri's termination. Certainly, the government did not disclose the grounds on its own initiative. If Olivieri volunteered

6

the grounds for his discharge in a future interview with another police department, that would have been unactionable self-defamation, not state disclosure.

In *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), state law tasked the Illinois Department of Children and Family Services ("DCFS") with determining whether credible evidence supported an allegation of child abuse by any given person. *Dupuy*, 397 F.3d at 497. If the DCFS found that an allegation was supported by evidence, Illinois law directed the DCFS to enter an "indicated" finding as to the responsible person on a central child abuse register. *Id.* at 497. State law compelled anyone marked as "indicated" on the central register who sought work in the childcare sector to authorize DCFS to disclose his "indicated" status to a prospective employer. *Id.* at 510. Thus, the Seventh Circuit held that the plaintiffs met the state publication requirement. *Id.* Like the classic case of the government blacklist, the DCFS—on its own initiative—disseminated damaging information to prospective employers. *Id.* Although *Dupuy* did not speak in terms of consent, its logic is really about whether the plaintiffs consented to disclosure of their "indicated" status. It is a well-established principle of common law that "the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation." RESTATEMENT (SECOND) OF TORTS § 583 (1977). "The privilege conferred by the consent . . . is absolute." *Id.* § 583 cmt. f. Although the *Dupuy* plaintiffs signed off on disclosure of their status through the DCFS system, that "consent" was involuntary because state law left them no choice but to consent; thus, consent did not operate as a defense to a stigma-plus claim there. *See id.* § 583 cmt. b ("consent

7

may be ineffective to bar recovery for defamation if it is obtained" in circumstances indicating it was not voluntarily given).

*Doe v. Purdue University* represented the first time the Seventh Circuit permitted a stigma-plus claim in the context of a university's student disciplinary finding. But, importantly, that case involved a student in a Navy ROTC program, a job training program linked with the university that ultimately leads to a career as a Navy officer. The student had a "legal obligation to authorize the disclosure" of his sexual misconduct finding to the Navy. *Purdue Univ.*, 928 F.3d at 662. Neither the Seventh Circuit opinion nor the district court opinion, *Doe v. Purdue Univ*ersity, 281 F. Supp. 3d 754 (N.D. Ind. 2017), *rev'd*, 928 F.3d 652, clarify where this "legal obligation" came from, but that did not matter, at least at the motion-to-dismiss stage. What mattered in *Doe v. Purdue University* was that some legal obligation allegedly vitiated any consent by the student to disclosure of his sexual misconduct finding—consent that would have otherwise defeated the student's stigma-plus claim.

B. *Application*

Applying the principles above to this case leads to the conclusion that John has not established a cognizable liberty interest under a stigma-plus theory.

First, given the parties' extensive briefing on the issue, a few words on the defense of consent is appropriate, if not entirely necessary to the decision in this case (as will become clear). Even if IU had told Purdue that John had committed sexual assault in connection with John's application to transfer to Purdue, as John alleges, (*see* 2d Am. Compl. ¶ 168, ECF No. 59), John would have no stigma-plus claim. That is

8

because John would have consented to publication by authorizing any defamatory disclosure from IU to Purdue. In turn, consent would bar John's recovery. John tries to fit his case into the mold of *Dupuy* and *Doe v. Purdue University*, but the facts, even as alleged, do not demonstrate here that any legal obligation vitiated his consent to IU's publication. In *Dupuy* and *Doe v. Purdue University*, the plaintiffs alleged that legal obligations to "consent" rendered involuntary and illusory any consent to publication they may have given. As a result, in those cases, consent was not a defense to recovery. But, here, there is simply no indication that John's consent to publication was involuntary or otherwise illusory. John cites no law requiring him to consent to IU's publication. True, as part of his transfer application, John agreed to "authorize secondary and post-secondary schools [he has] attended to release information needed by Purdue to process and verify [his] application." (ECF No. 59-8.) He also "affirm[ed], under the penalties for perjury, that the provided representations [in his transfer application], including information related to my citizenship status and/or presence in the United States[,] are true." (*Id.*) But neither of these pre-conditions to submitting a transfer application to Purdue amounts to a legal obligation to consent to disclosure of defamatory information. To truly parallel *Dupuy*, John would have needed to show that some extant legal obligation—like a statute or regulation—required him to consent to IU's disclosure of his sexual misconduct finding whenever he applied to any university that could support his prospective career as a businessman. Instead, John has merely shown that one transfer application to one such university required consent to disclosure as a pre-

9

condition to applying. That pre-condition simply does not look much like the blanket state law that vitiated the plaintiffs' consent in *Dupuy*. It looks more like voluntary consent. *See Eitler v. St. Joseph Reg'l Med. Ctr. S. Bend Campus, Inc.*, 789 N.E.2d 497, 500 (Ind. Ct. App. 2003) (Employee was required as part of application to Employer B to authorize Employer A to fill out evaluation form about Employee; Employer A sent a negative evaluation of Employee to Employer B; Employee sued Employer A for defamation; Employee had no claim because Employer A's publication was absolutely privileged by consent).

In any event, the Court need not squarely hold that John's consent bars recovery because the evidence indisputably shows that IU *never disclosed false and defamatory information* to any third party—with John's consent or not. According to IU's Associate Dean of Students and Director of Student Conduct, IU's Office of Student Conduct has never sent John's "disciplinary records to Purdue University, or any other university or college." (Spotts Decl. ¶ 7, ECF No. 66-3 at 6.) John now concedes that IU has never disclosed the *content* of his disciplinary record to anyone. (ECF No. 78 at 8.)

However, there is evidence that IU disclosed the *fact* of John's suspension. John requested that IU's registrar send his transcript to Purdue as part of his transfer application. (Spotts Decl. ¶ 8, ECF No. 66-3 at 6; Doe Decl. ¶¶ 15–17, ECF No. 72-1 at 4.) IU granted the request. (Spotts Decl. ¶ 8, ECF No. 66-3 at 6.) John's transcript contains the following notation:

STUDENT IS ON DISCIPLINARY SUSPENSION EFFECTIVE 12/16/2019

(ECF No. 72-2 at 5.) This notation, John says, constituted publication by IU to Purdue for purposes of his stigma-plus claim. Setting aside his consent to that publication, John is incorrect because a true statement cannot create liability for defamation. *See* RESTATEMENT (SECOND) OF TORTS § 558 (1977); *Martino v. W. & S. Fin. Grp.*, 715 F.3d 195, 206 (7th Cir. 2013) ("Any statement actionable for defamation must not only be defamatory in nature, but false."). By its terms, the notation is true. No one can dispute that John has been on disciplinary suspension since December 16, 2019. That is, in fact, a foundational premise of John's lawsuit. (*See, e.g.*, 2d Am. Compl. ¶ 1, ECF No. 59 (alleging that IU's suspension of him caused irreparable harm).)

John protests that, even if the notation is technically true, it inescapably implies that John did something wrong that was worthy of discipline, when John says he did nothing wrong. The plaintiff in *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354 (7th Cir. 2019), made precisely this argument in a defamation suit against his former employer. The employer in *Yeatts* had disseminated a document stating that the plaintiff was "[s]uspended in connection with [a] corruption-related investigation involving Biomet Brazil." 940 F.3d at 358. Noting that truth was "a total defense to a defamation claim," negative implications notwithstanding, the Seventh Circuit held that the employer's statement about the fact of suspension was "not actionable defamation." *Id.* at 359. You could say the same thing about the notation on John's transcript, which states the incontrovertible fact that John has been on disciplinary

11

suspension since December 16, 2019.² The notation is true, so it is "not actionable defamation," *id.*, no matter the implication.

In sum, there is no evidence that IU ever disclosed to a third party that it had found John guilty of sexual misconduct. In addition, any statement about the fact of John's suspension is not actionable. Accordingly, there is no genuine dispute that the state-disclosure element of the stigma-plus test has not been met.

## IV. Conclusion

By adducing no evidence of state disclosure, John has failed to establish a cognizable liberty interest to sustain his due-process claim, so IU is entitled to judgment as a matter of law. Accordingly, IU's motion to dismiss, (ECF No. 60), after conversion to a motion for summary judgment under Rule 12(d), is **granted**. All claims are **dismissed with prejudice**. Final judgment shall issue in a separate order.

As a final housekeeping measure, the Clerk is **directed** to replace on the docket Defendant "Indiana University" with "Trustees of Indiana University." The Clerk should also note that the motion to strike, (ECF No. 76), was **granted in part and denied in part**.

**SO ORDERED**.

---

² Here, IU did not even say *why* John was suspended in its notation on his transcript, unlike the employer in *Yeatts*, who disclosed that the employee was suspended because he was suspected of corruption. If anything, IU's defense of truth as to the notation is even stronger than the defense in *Yeatts*.

Date: 5/4/2021

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to registered parties of record via CM/ECF.

13